STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. RICHARD R. MYERS, DEFENDANT-APPELLANT.

Argued May 28, 1951—Decided June 25, 1951.

*Mr. Joseph Weintraub* argued the cause for appellant (*Mr. Edward R. McGlynn and Mr. Burnett B. Zimmerman,* attorneys; *Mr. Brendan T. Byrne,* on the brief).

*Mr. Richard J. Congleton* argued the cause for respondent (*Mr. C. William Caruso,* on the brief).

The opinion of the court was delivered by

WACHENFELD, J. The interest created by the unusual circumstances here involved is accentuated by the assertion that the facts are unparalleled in this or any other jurisdiction.

The defendant was convicted of murder in the first degree and sentenced to life imprisonment as recommended by the trial jury.

The nub of the episode is a command by the husband to his wife to jump into the Passaic River. She did so and was drowned.

The defendant contends the proof did not establish that her entry into the water was intentional and in compliance with his order but indicates she slipped or fell. He says she had been "spanked" as presently narrated but he did not threaten her life with a weapon nor was he armed; there were no circumstances suggesting her life would be endangered by his violence if she did not jump, "nor was there evidence that he anticipated that, if she responded to the threat, anything more than a disciplinary dunking would result."

Whether the so-called "spanking" and the "disciplinary dunking" are properly termed or tenable under the proofs will be developed as we progress.

The defendant and his wife were married in 1946. He was then 22 years of age and she 16. He was employed as a boiler manufacturer and his wife was a part-time domestic. Their married life was stormy and controversial, with frequent violent quarrels and separations followed by reconciliations.

The deceased left her husband five days before the commission of the crime. On the night of April 8, 1950, the defendant, accompanied by his wife's stepfather, Frank Byrd, while trying to repair his car, noticed his wife, accompanied by two men, go into a tavern almost across the street at Market and VanBuren Streets. He got "mad." He went to the tavern and called her outside. They walked down Market Street and before she could explain where she had been, he "hit her in the face with my open right hand."

She broke away and fled, running toward the Jackson Street bridge. He chased "right behind her." When he caught up to her he "hit her three or four or five licks on the

shoulder with my open hand, also with my fist." The wife muttered: "Don't, don't, let me explain," and again broke away. He caught her near the steps of the bridge, where "I started punching my wife again mostly on the shoulders and the side of the face and my wife was crying and hollering."

She again attempted to elude him. "I was after her. My wife is hollering, 'Stop, stop,' and she is running and I catch up with her by a big rock that is near the bank of the river. I grabbed my wife by the collar and she is hollering she wants to explain everything, and I hit her again a half dozen or more times with both hands, fists and open hands both."

The wife sought to prevent the beating by holding his arms and legs. "I grabbed her by the collar and picked her up." She asked for forgiveness and was crying. "Then I told my wife to go ahead and jump in the goddam river and she put her foot in a hole into which some river water was seeping and she told me the water was too cold." There was some conversation as to where she had been during her absence. "Then I started to hit my wife again," and he accused her of staying at another man's house. He charged her with lying and called her many vile and filthy names, interwoven with intensive profanity.

"I was good and mad at this time. I then told my wife that if she did not jump in I would push her in. My wife and I are right at the edge of the river now, near the big rock. I am standing up and she is sitting down on the rock."

"My wife then got up from the rock and went to the side of the dock and I am standing on the side of her. I told my wife again and again that if she did not jump in the river I would push her in. At this time my wife is sitting on the edge of the dock and the third time I told her that if she did not jump in the river I would push her in I am standing to my wife's right with my back to the bridge and at this time my wife is holding on to the edge of the planking along the river bank and the water is about three or four

feet below her. The tide is high and after I told my wife the third time that if she did not jump in the river I would push her in she let go her hold and dropped in the river."

"I saw my wife go out about two or three feet into the river and she started to holler for me and asked me not to go away but to come and get her. She was struggling in the water and I saw that she was being carried away from the Jackson Street bridge downstream. I stayed there about a minute, I saw that my wife was being carried down the stream, I could just see the top of her head. I could not see her hands and I heard my wife still hollering, 'Don't go away.' I ran away to my mother's house thinking that my wife drowned."

After visiting his mother and his aunt in a fruitless attempt to borrow money to go away, the defendant went to a poolroom in the neighborhood and asked the owner, Dozier, to take him home. Dozier and another man, Hush, did so. During the automobile trip the defendant volunteered the information that he made his wife "jump overboard."

Later the same night the defendant again visited his mother's house and this time was able to borrow $2 from his grandmother which, with his own funds, was sufficient to purchase a bus ticket to Winchester, Virginia. He left Newark at 1:25 A. M. on April 9th and arrived in Winchester the following afternoon. There he surrendered to the police at about six o'clock in the evening.

All the quoted phrases in the narration of the above facts are taken from the defendant's statement, S-19. Presumably it was given freely, without threat or compulsion. That it was obtained in compliance with our rules and procedure and is voluntary is apparent from the fact that no question concerning its validity was raised either at the trial or on this appeal.

Another statement, S-18, was also admitted without objection. It varies in some details but in the main is a duplication and its truthfulness likewise was not questioned.

A bridge tender on the Jackson Street bridge, on duty that night, between ten and ten-thirty P. M. saw a man and a woman coming down Raymond Boulevard. The man was "like he was hitting her" and he was "slapping her like on the face." He was "dragging her across the boulevard" and "had her by the back of the neck or the collar or the hair." He gave a description as to how the two individuals were dressed. This testimony was the subject of a motion to strike and will be treated again hereafter.

The sister of the deceased testified that the couple were "arguing all the time and they didn't get along"; that in 1947 the defendant had assaulted his wife by stabbing her in the arm; that, on another occasion in the same year, he dragged his wife down to the Passaic River, where he made her "strip"; and that he had often said he wanted to kill her. This testimony, it is claimed, should have been excluded and will again be referred to in that regard.

The State proceeded on the theory that the deceased's jumping into the river was caused by the defendant's assaults and threats of physical violence, constituting well-grounded fear and apprehension on her part, and that the death amounted to a willful, deliberate and premeditated killing.

The alleged errors are: the denial of a motion for a directed verdict of acquittal upon the ground there was no evidence to support the indictment; the denial of requests to charge bearing upon the evidence necessary to justify the verdict; the court's refusal to charge that reasonable doubt could arise from the want of evidence or lack of proof; the court's charge as to the elements of murder in the first degree and murder in the second degree; the exclusion and admission of certain testimony; the failure to properly poll the jury when the verdict was returned; the limiting of cross-examination; the admission of certain photographs; and the refusal to strike the testimony of the witness Manning. It is further contended the verdict is against the weight of the evidence and that mere threatening words, accompanied by

blows not likely to be fatal in their severity, are insufficient to sustain it.

The defense moved for judgment at the close of the State's case and the denial of the motion is advanced as error principally because there was supposedly no evidence of an intent to kill the deceased.

Admittedly such intent is rarely provable by direct evidence and is generally inferred from other proof, but it is alleged there was no such proof here because the "spanking" administered, no matter how viewed, does not evidence such intention. "The blows were not of deadly character either in nature or in respect to the area of the body to which they were addressed," it is stated, citing *Wellar v. People*, 30 *Mich*. 16 (*Sup. Ct.* 1874), which holds where an attempt is not committed with a deadly weapon, the intent must be clearly felonious or the death will subject the assailant only to the charge of manslaughter.

It is also argued that the threat to push the deceased into the river if she did not jump does not add a deadly quality to the blows, which were not otherwise of that character, nor did the defendant have knowledge that the river at that point was sufficiently deep to cause drowning.

Likewise it is urged there was no evidence that her entry into the water was intentional but might have been by misadventure. An attempt is made to bolster this theory by the assertion that what the defendant did could not constitute the proximate cause of the murder and that the defendant did not cause the death, which was the result of either an accident or a voluntary act by another, to wit, the deceased herself.

The law was enunciated under somewhat similar circumstances as early as 1842 in the case of *Regina v. Pilts*, 1 *Carr. & Mar*. 284, reported in 174 *Eng. Rpts*. (*Full Reprint*) 509. The charge there was also murder by drowning. The body of the deceased was found in a river. The defendant and another person had been drinking with him the previous evening and later were seen following him "in a suspicious

manner." The person accompanying the defendant turned Queen's evidence and testified that he and the defendant had inveigled the deceased to the river edge where the defendant attempted to rob him. A scuffle ensued and the deceased had been pushed into the water.

■ These facts, of course, possess elements not present in the case *sub judice* but the law as defined by the court is nevertheless applicable:

"A man may throw himself into a river under such circumstances as to render it not a voluntary act by reason of force applied either to the body or mind. It becomes then the guilty act of him who compelled the deceased to take the step but the apprehension must be of immediate violence and well-grounded from the circumstances by which the deceased was surrounded; not that you must be satisfied that there was no other way of escape but that it was such a step as a reasonable person might take."

*Wharton, Criminal Law, sec.* 206, *p.* 266, referring to the rule, says:

"He, therefore, who causes another, under influence of fright, to run into the river, from which drowning ensues, is responsible for the death."

In *Norman v. U. S.,* 20 *App. D. C.* 494 (*Ct. of App. D. C.* 1902), the defendant was charged with murdering a woman. The indictment contained two counts, one alleging that he threw her in a canal and she drowned and the other alleging that she, in attempting to escape his murderous assault, fell in the canal and drowned. The jury returned a verdict of "guilty as indicted without capital punishment" and the defendant was sentenced to life imprisonment. The appellate court affirmed the conviction, saying:

"Under the circumstances, in order to convict the defendant of felonious homicide, it was not necessary that the prosecution should show or that the jury should believe that the defendant had the malicious intent actually to do bodily harm to the deceased or to take her life. As a proposition of law, the defendant was guilty of murder under the second count of the indictment, if, in seeking to

escape his violent assault upon her, the deceased had a well-grounded belief that the defendant intended to take her life or inflict further serious bodily injury upon her, and so believing inadvertently fell into the canal and was drowned."

The defendant's conviction of manslaughter was upheld in *Letner v. State*, 299 *S. W.* 1049 (*Tenn. S. C.* 1927), upon the theory that the defendant's unlawful act was the proximate cause of death where he fired some shots in the water near a boat occupied by three persons, frightening them so that one of the occupants leaped overboard and in doing so upset the boat, causing himself and one of his companions to be drowned in the water.

*Whiteside v. State*, 29 *S. W.* 2d 399 (*Tex. Ct. of Crim. App.* 1930), was a case in which the defendant was indicted for murder and on conclusion of the evidence the court submitted the case to the jury, charging them that before they could convict they would have "to find from the evidence beyond a reasonable doubt that appellant threatened his wife, and, with malice aforethought by threatening words and gestures, did so terrorize and frighten her that she had a well-grounded apprehension that her life was then in danger at the hands of appellant, and that by reason of such apprehension she jumped from a window and thereby injured herself in such manner as caused her death, and that said threatening words and gestures of appellant were reasonably calculated to produce and did produce the act of the wife in jumping from the window." On this charge, a verdict of guilty was returned and was subsequently affirmed by the appellate court.

So too, in *Sanders v. Com.*, 50 *S. W.* 2d 37 (*Ky. Ct. of App.* 1932), the appellate court sustained the manslaughter conviction of the defendant returned on an indictment for murder. There a quarrel ensued while the husband was riding with his wife and an infant in the car. He struck his wife severely and cut her with a pocket knife. She either jumped or fell from the car and died of resulting injuries. The appellate court found there was evidence from which

the jury might properly have inferred the wife's action in jumping or falling from the automobile resulted from a reasonable fear of further assaults by the defendant imperiling her life or safety.

A similar case is *Paterson v. State*, 184 *S. E.* 309 (*Ga. S. C.* 1936). The defendant had made improper advances to a 15-year-old girl who was riding with him in his car and apparently being in fear of an ultimate criminal assault, she jumped, sustaining injuries from which she died. There was a reversal but the court, citing with approval *Regina v. Pitts, supra*, sustained the general rule that an indictment for murder would lie if it appeared that the fatal act of the deceased was taken in pursuance of a well-grounded fear or apprehension of immediate bodily injury arising from the defendant's unlawful conduct.

The defendant was convicted of manslaughter on an indictment for murder of his wife in *Whaley v. State*, 26 *So. 2d* 656 (*Fla. S. C.* 1946). There, as here, the defendant saw his wife in a cafe with a stranger, which aroused him to extreme anger. He drove with her to an isolated spot and beat her with his fists. Thereafter, while he was driving, she jumped from the moving car and sustained injuries from which she died. The state's theory was that the wife sought to escape when she feared another beating, as he admitted he "moved back like I was going to hit her with my fist and she jumped out." The conviction was sustained, the court ruling that a person who by actual assault or threat of violence causes another, upon a well-grounded or reasonable fear or apprehension, to do an act resulting in physical or corporal injury which causes his death, is responsible for the homicide.

More recently, in *Commonwealth v. Dorazio*, 365 *Pa.* 291, 74 *A. 2d* 125 (*Sup. Ct. Pa.* 1950), second degree murder was sustained where a member of a rival union walked behind the deceased and started an assault with his fists and the deceased, in attempting to avoid the attack, ran up a flight of steps into a corridor with the defendant in close pursuit.

The deceased fell and was severely beaten by the defendant, sustaining a fractured skull from which he died. There, as here, it was contended that the defendant could not be guilty of more than manslaughter because malice could not be imported from the use of fists without other evidence of intent to inflict grave bodily harm. The court said:

"Whether the malice necessary to constitute murder may be implied from the use of fists alone must depend upon the particular circumstances * * * The size of the assailant, the manner in which the fists are used, the ferocity of the attack and its duration, and the provocation, are all relevant to the question of malice * * * Fists, though not ordinarily a deadly weapon, may become deadly by repeated and continued blows applied to vital and delicate parts of the body of a defenseless, unresisting victim.

It is not necessary that the injury be intended to be permanent or dangerous to life, it is malicious to intend injuries such as to seriously interfere with health and comfort."

In the case *sub judice,* no suggestion is made of a physical endeavor by the wife against her husband. Her sin, if any, was in excessive sociability in a sphere which aroused his anger to a point where he vowed it would not again occur.

The violent onslaughts, the numerous applications of force, the physical dragging by her hair or neck across the boulevard, plus the frightening threats, had reduced her to a grovelling, pleading bit of abject humanity begging for mercy and humbly seeking a cessation of the repeated violence applied.

She was cornered between her assailant and the river, with no means of escape except past him. The terror created by his course of conduct forced her to select what she seemingly thought was the lesser of two evils in following his repeated command.

Perhaps she did so in the hope that his anger and hatred might then subside and, having proven himself complete master, he would relent and assist her out of the water, to another reconciliation; but he stood as silent as the night itself, calmly watching her struggle for life and listening to her repeated anguished cries. There was no thought or pre-

tense of giving aid or attempting a rescue. He did not even raise his voice in a call for help which might have been heard and answered.

The death struggle took place only a few feet away from him, punctuated by pitiful calls for assistance. His failure to respond in any manner under these harrowing circumstances reveals how hardened his intention and determination had become. His behavior was not only diabolical but clearly proves the design he formulated—the riddance of his wife, who had angered him for the last time.

■ The jury had a right to believe, from the proof submitted, that the deceased's death was due to the defendant's unlawful conduct which, together with the assaults and threats of violence, caused her to commit an act resulting in her death, which the defendant intended within the meaning of our statute. We see no error in this respect nor do we think the jury's determination contrary to the weight of the evidence.

The defendant's theory that his physical remonstrances with his wife were merely disciplinary treatments administered by him for corrective purposes without realization or anticipation of the results which occurred, is so far out of line with and so foreign to the proven facts and their natural inferences as to be absurd.

The series of assaults with fists and open hands, the frequency, the way and manner of their occurrence and infliction, the time and place, the painful and violent dragging of the deceased across the boulevard, the vile and vituperative names uttered with hatred and venom, cannot all be shrugged off under the heading of a "spanking."

The "voluntary dunking" as a mild chastisement, which is now the mental operation of the defendant as an explanation of what transpired, has little merit in view of the circumstances preceding the wife's entry into the river. His conduct was irreconcilable with anything constructive or corrective. It smacks rather of a preconceived scheme to bring about her death in a manner which would still give

him an opportunity to deny full responsibility if he could find a jury gullible enough to agree with him.

Photos S-3 and S-4, not in the printed record but made available to the court by stipulation, the originals being filed with the clerk, indicate clearly the sharp embankment three or four feet above the edge of the water, making apparent both the depth and the current of the river. It was not a location where one would go wading. When there is added the defendant's knowledge that his wife could not swim and his observation that "the tide was high," the pattern becomes significant. We are in accord with the jury's views.

Error is alleged in the court's refusal to make certain requested charges. The first group were instructions that to sustain a conviction the jury would have to find the defendant's threat to push his wife into the river was "accompanied by physical force or show of force sufficient to endanger life."

The court, though not adopting the exact phraseology proposed by the defendant, charged on this point in the words of *Regina v. Pitts*, quoted above, and added:

"The act of the deceased in jumping into the river being in its nature voluntary, the above test must be applied before the defendant can be found guilty. In order for an act committed by one which subjects herself to bodily injury to be the act of a reasonably prudent person in avoiding the acts of another, it must have been either an avoidance of acts of another which would have occasioned bodily injury or in reasonable apprehension of immediate bodily injury. No person can be said to have acted as a reasonably prudent person if she subject herself to serious bodily injury or death merely to avoid acts of another, not calculated to, nor reasonably feared to, affect life."

■ This fully informed the jury they must first find the defendant's actions and threats were such as to put a reasonably prudent person in fear of his life and had impelled the deceased, acting as such person, to take the steps which culminated in her death.

■ The substance of the request was covered by the instruction given. The court need not charge in the exact

language submitted provided the subject matter of the request has been fully covered, nor has the defendant the right to choose the language in which the court should state the pertinent instructions he is entitled to. *State v. DePaola,* 5 *N. J.* 1 (1950); *State v. Tansimore,* 3 *N. J.* 516 (1950); *State v. Bunk,* 4 *N. J.* 461 (1950).

The defendant requested the jury be charged:

"You are instructed that the defendant has no duty or burden to come forward with any evidence nor prove any of the facts in the case, and if there is any material part of the case which is not proved beyond a reasonable doubt, then you must acquit the defendant."

This request was refused and the court charged:

"The defendant is presumed to be innocent and he must be proved beyond a reasonable doubt guilty of the crime charged and of each and all of the elements. He cannot be convicted of any crime or of any degree of crime unless as proven guilty thereof. The burden of proving the defendant guilty beyond a reasonable doubt rests upon the State throughout the whole case and never shifts. This rule is an ultimate one surviving all others. It is an independent and final protection to the defendant; and notwithstanding all other presumptions and burdens and intermediate issues, if any arise in the case, it remains upon the State until and after all the evidence is in, when the jury must consider upon all the evidence in the case whether or not this burden has been sustained. If the jury are then satisfied upon all the evidence that the defendant is proved guilty beyond a reasonable doubt, the verdict must be guilty of the crime so proven. If not so satisfied, the verdict must be not guilty."

Here, again, the substance of the request was covered by the court's charge. The jury was instructed that it must determine whether the State had carried its burden of proof. The import was inescapable in the charge as given that if the State failed to do so, either by conflicting evidence or by lack of evidence, leaving a reasonable doubt in the minds of the jury, its duty was to bring in a verdict of acquittal.

The defendant cites *State v. DePaola, supra,* as authority for his contention that the refusal of the charge here requested was error. In that case, the request was to charge a "reasonable doubt may be engendered by lack of evidence." The court refused to so charge and, in explaining the doctrine of

reasonable doubt, said it may be created "upon such proof," referring to the evidence submitted. Similarly, in *State v. Andrews*, 77 *N. J. L.* 108 (*Sup. Ct.* 1908), a civil case, the court charged:

"* * * your reasonable doubt as to whether it was before or after must be founded upon some evidence that was presented in this cause, if there is a reasonable doubt."

Thus the burden was inferentially cast upon the defendant to produce evidence that would create reasonable doubt and so justify his acquittal; the jury's attention was specifically directed by the court to the evidence produced and the question of lack of evidence was excluded from their deliberations.

In the present case, no specific instruction on reasonable doubt arising from lack of evidence was requested. Even so, the charge given by the court did not preclude the jury's consideration of such lack, if there was any, but on the contrary instructed them that the burden of proving every essential element of the offense charged lay upon the State at all times. We find no error here.

In the course of its charge the court said:

"The distinguishing factor between murder of the first degree and of the second degree is the intent with which the homicide was committed. In first degree murder there must be the intent to take life. In second degree murder the intent merely need be to do grievous bodily harm. Where a person takes another's life with intent to do grievous bodily harm, it is murder in the second degree."

Error is alleged in the instruction that the distinguishing feature between first and second degree murder is the intent to take life.

There is little justification for the trial court's failure to follow our admonition in the *DePaola* case, *supra*, where we said:

"However, our adherence to the law as already adjudicated does not justify a trial court in repeating to a jury a charge which has on numerous occasions been declared unsound by our court of last resort in the respect complained of."

■ It should have been clear from the language there employed that this error was not to be continued and the failure to follow our edict is quite beyond our comprehension. We doubt, however, it was deliberate. We repeat our words in the *DePaola* case, with the expectation that our warning will be heeded and followed. For the reasons there given, however, we refuse to reverse the conviction on this ground.

On direct examination the defendant was asked: "You didn't really think she was going to go into the river?" It is contended the defendant had a right to show his state of mind during the incident leading up to his wife's death and it was error for the court to have sustained the State's objection to the question.

■ Where self-defense is interposed to an indictment for homicide or homicidal assault, the defendant is entitled to testify to the state of mind which impelled him to commit the act complained of. *State v. Len,* 108 *N. J. L.* 439 (*Sup. Ct.* 1932); *Wallace v. U. S.,* 162 *U. S.* 466, 40 *L. Ed.* 1039 (1896).

■ Here, however, self-defense is not an issue and the question was designed to elicit not the defendant's "state of mind" but rather his opinion concerning his wife's intent. His guess as to another's state of mind was immaterial.

■ The defendant cites as error the manner in which the jury was polled. After the foreman had announced the verdict as murder in the first degree with a recommendation of life imprisonment, the clerk of the court repeated this finding to each juror individually and asked him if that was his verdict. The jurors replied variously: "Yes," "Yes, sir," "It is." The clerk thereafter repeated the verdict as announced.

The defendant attacks this method of polling the jury, relying on *State v. Cleveland,* 6 *N. J.* 316 (1951). There, after the foreman had announced the verdict, the individual jurors were asked: "How do you find?" and each replied: "Guilty." The degree of murder was not stated either in the question asked the individual jurors or in their answers.

Such is not the case here. The jurors were asked if they found the defendant guilty of murder in the first degree with a recommendation of life imprisonment and each one expressly indicated that was his verdict. Each juror announced his finding of the defendant's guilt and specified the degree of murder. The right to a poll of the jury set forth in *R. S.* 2:138–2 and *Rule* 2:7–9(*d*) was fully satisfied.

It is next contended that testimony should not have been admitted relating to former incidents between the defendant and his wife. The victim's sister was permitted to testify over objection that the defendant stabbed his wife in the arm in 1947 in the course of an altercation between them. Again over objection she was allowed to recount an episode which occurred in the same year when the defendant took the deceased to the Passaic River and made her strip in preparation to jumping in. These incidents were related without elaborating details. It is urged they were too remote in point of time to be admissible.

 Such evidence may not be introduced for the purpose of showing the defendant committed the particular crime of which he is charged but is admissible to show malice or ill will on the part of an accused toward his victim. *State v. Donohue,* 2 *N. J.* 381 (1949); *State v. Overton,* 85 *N. J. L.* 287 (*E. & A.* 1913); *State v. Lieberman,* 80 *N. J. L.* 506 (*Sup. Ct.* 1911), affirmed 82 *N. J. L.* 748 (*E. & A.* 1912).

Evidence of an altercation between the accused and the deceased which had taken place some 10 or 11 years prior to the crime charged was admitted in *State v. Schuyler,* 75 *N. J. L.* 487 (*E. & A.* 1907), Chief Justice Gummere saying:

"The logic of this deliverance is unanswerable, and underlies the settled rule of the criminal law that the remoteness of the time of such occurrences goes solely to their weight and not to their admissibility."

In *Sanders v. Commonwealth, supra,* the court under similar circumstances commented:

"The alleged incompetent evidence, the admission of which appellant contends was prejudicial, is that relative to assaults made upon

his wife on occasions prior to her death. This evidence was admitted for the sole purpose of showing the state of feeling on the part of the accused towards the deceased, and the jury was so instructed. It was clearly admissible for that purpose."

The assertion that details of prior incidents between the defendant and his wife were unduly particularized is not supported by the record. The witness, though voluble in her mode of expression, told no more than the general nature of the altercations and the times and places of their occurrence.

The defendant objects to the exclusion of a part of the testimony of the deceased's sister. She was asked: "You are angry with Richard, aren't you?" and, upon objection by the State, was not permitted to answer. The defendant urges that he had a right to inquire into the matter in order to show such prejudice and partiality on the part of the witness as would affect her credibility.

We think the question unobjectionable and believe it should have been allowed for the purpose stated by the defendant. Without speculating on what the witness's answer would have been, an examination of the record leads us to the conclusion that the error was not prejudicial. The jury had already heard sufficient testimony from the sister of the deceased wife to infer that she was not altogether kindly disposed toward the accused. The answer to the question was obvious and, under the circumstances, we find here no prejudicial error constituting a ground for reversal.

The defendant complains of the admission into evidence of photographs showing the corpse of his wife after it was found more than two weeks after the drowning and asserts the State's purpose in introducing the photographs was to inflame and prejudice the jury. It was conceded the photographs did not show any injury resulting from the beating inflicted on the wife.

The pictures were relevant to establish the fact of the wife's death by drowning and they were admissible to establish identification and the corpus delicti. The mere fact they were cumulative, since there was other testimony to establish the cause of death and the identification of the

victim, did not of itself render them inadmissible. *State v. Fine,* 110 *N. J. L.* 67 (*E. & A.* 1932).

As to the time element, in *State v. Heathcoat,* 119 *N. J. L.* 33 (*E. & A.* 1937), the photographs of the deceased wife and her surroundings were taken nearly three months after the crime was committed and they were held admissible because "the conditions were those created by the defendant himself and there is nothing to suggest a change in the body or the premises except the ravages of time on either. The admissibility of photographs under such circumstances is too well fortified to admit of doubt."

The final point urged by the defendant is that the court erred in refusing to strike the testimony of one Manning, a bridge tender, who testified that on the night of the incident, between ten and ten-thirty P. M., he saw a man and a colored woman fighting in the vicinity of the area where the defendant admits the quarrel with his wife took place and where she subsequently entered the river. He was unable to identify the defendant as the person whom he saw and he sets the time of the struggle he describes as being a half hour to an hour earlier than the time fixed by the defendant. These apparent discrepancies are not uncommon. The fallibility of human recollection and the considerations thus raised go to the weight to be accorded the testimony rather than to its admissibility. The jury was fully cognizant of the difference in time, the failure of positive identification and the distance separating the witness from the events which he related. Having all the pertinent facts thus fully before it, the weight, if any, which it gave his testimony was a matter for its determination.

The judgment below is affirmed.

CASE and HEHER, JJ., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, WACHENFELD, BURLING and ACKERSON—7.

*For reversal*—None.