206 N.J. Super. 72 (1985)
501 A.2d 1024
DANIEL CHAVANNE, A MINOR, BY HIS FATHER AND GUARDIAN AD LITEM, EDWARD CHAVANNE, AND EDWARD CHAVANNE, IN HIS OWN RIGHT, PLAINTIFFS-APPELLANTS,
v.
CLOVER FINANCIAL CORPORATION AND CHADWICK VILLAGE APARTMENT, LTD., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted November 6, 1985.
Decided December 9, 1985.
*75 Before Judges PRESSLER, DREIER and BILDER.
Paul R. Melletz, attorney for plaintiffs (Donna L. Freidel, on the brief).
Israel N. Eisenberg, attorney for respondents (Mr. Eisenberg, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Plaintiffs have appealed from a $9,000 damages judgment entered after a jury verdict in a damages-only trial. In the earlier liability trial the infant plaintiff, five years old at the time of the accident, had been determined to have been 40% negligent and defendant the owner of the apartment where the child and his mother were visiting, 60% negligent[1]. Defendant had in the liability trial filed a third-party complaint against the child's mother and the tenant in the apartment, claiming negligent supervision of the child. Defendant claimed that the mother should be responsible to indemnify defendant pursuant to the Joint Tortfeaser Contribution Law, N.J.S.A. 2A:53A, for *76 "the injuries and damages sustained by Daniel Chavanne [the minor] and Edward Chavanne [Daniel's father, the guardian ad litem and plaintiff in his own right]." The father had claimed reimbursement of medical expenses and deprivation of "companionship, assistance, love and affection." This claim was dismissed by the trial judge on the mother's motion[2].
The facts in this case show that the child was injured when he fell through a glass door suffering facial lacerations. The primary permanent injury was a two inch facial scar. Immediately after the accident Daniel's mother closed the wound, applied cold compresses and summoned her husband. The crying child was taken to West Jersey Hospital where he was treated in the emergency room with his parents remaining close at hand. The next day he was taken to the family doctor who changed the dressing and gave the boy a tetanus shot. He again was screaming while the shot was given and it took three people to hold him down. During a second visit the dressing was changed and on a third visit the stitches were removed in a procedure that took approximately one hour including a break so that Daniel could calm down. Again three people were needed to hold the child during this procedure. The boy missed approximately one week of school and for the next month was *77 not permitted to run or jump. When plaintiffs' counsel attempted to question the mother as to "any problem with Danny concerning his being teased," the trial judge foreclosed such questioning stating: "I think we have to confine ourselves to pain and suffering." The mother did state, however, that "Danny used to hang his head constantly and try to hide the scar" and still occasionally holds his head in that manner.
Plaintiffs' expert, Dr. Darast, testified that the scar in question[3] could be made less noticeable by dermabrasion and Z-plasty which, although not eliminating the scar, would make it less noticeable by "smoothing the scar and tissue" and "narrow[ing] it down and place[ing] it within the skin lines, tension folds so to speak." After cross-examination the trial judge explored the witness' characterization of the benefits of the operative procedures:
THE COURT: How would you characterize this scar when you first saw it, between one and ten, ten being the worst, one being the least mild ... would you consider it mild?
WITNESS: I would say five.
THE COURT: Five, o.k., and now?
WITNESS: Now it is about three.
THE COURT: And after the dermabrasion it would be about a one?
WITNESS: One.
Plaintiffs' first claim of error is that this exchange, initiated by the judge and not the subject of a trial objection, "greatly prejudiced plaintiffs' case and impermissibly directed and controlled the jury's verdict." Cf. Cox v. Valley Fair Corp., 83 N.J. 381 (1980); Gilborges v. Wallace, 153 N.J. Super. 121 (App.Div. 1977), aff'd in part and rev'd in part 78 N.J. 342 (1978); Botta v. Brunner, 26 N.J. 82 (1958). The trial judge should have left the characterization of severity up to the jury. Although we view this exchange as a good faith attempt by the judge to have the expert quantify the benefits surgery could bring, the danger with this type of questioning is that a plastic surgeon may characterize the eventual scar as a "1" based *78 upon his vast experience in dealing with scars, unshared by the average juror. Such testimony can, therefore, unfairly depreciate the injury in the individual case. We recognize that the thrust of the questioning was not so much to assess the intensity of the scar on an absolute scale, but rather to show the progress of the scar from the first examination to the time of trial and then extrapolate that progress to the condition that would exist after surgery. We also appreciate that the jury could have evaluated the expert's ratings based on the photographs in evidence and their own observation at trial and, therefore, were not wholly left to match their inexperience against the specialized background of the expert. But since on balance the potential for confusion by the use of such characterization outweighs its benefit, such expert "rating" should not be repeated on retrial.
Plaintiffs have also asserted that the trial judge throughout the proceeding had indicated to the jury his disdain for plaintiff's claim. We have read the transcript with care and although there are individual comments that apparently deprecate plaintiff's claims, we find no basis for reversal on this ground.
Plaintiff next raises the serious problem of exclusion of the testimony concerning the boy's physical pain, suffering and embarrassment. Here also we determine that the trial judge was incorrect in limiting the testimony. The trial judge excluded the testimony on both a hearsay basis and for the reason that "we have to confine ourselves to pain and suffering." The statements of other children to Daniel causing him to feel embarrassed were not hearsay in that they were not offered for the truthfulness of their content, only for the fact that they were so understood by him. It was his feeling of embarrassment, stated to his mother, that was relevant to the issue of damages, and such statements to his mother concerning his then-present feelings and state of mind were admissible under the hearsay exception contained in Evid.R. 63(12). The *79 embarrassment from what Daniel perceived to be teasing, with its concomitant psychological damage, if any, was very much a part of his overall damage claim and should not have been foreclosed by the trial judge.
Although some photographs were permitted in evidence, others were excluded with the judge's comment that "we have the live child. Why do we need photos?" The judge failed to perceive that the photographs were necessary to show the progress of the scar, and that the presence of the child did not serve the same purpose as the photographs of the scar in its earlier condition. On remand, admission of the additional photographs should be passed upon to determine whether they depict the scar in different stages of healing.
The trial judge also foreclosed the plaintiff father from testifying with regard to why the parents had not had the dermabrasion performed on the two other small scars. Presumably the question was posed to the father to meet defendant's argument that the dermabrasion costs should not be awarded since the parents had chosen not to use the process on the other scars that preexisted this accident. The scars had already been noted during cross-examination of plaintiff's expert, and plaintiff should not have been foreclosed from answering these questions.
The plaintiff father claims he was precluded from testifying fully concerning his own observations of his son at the emergency room and describing the stitching procedure which was causing the boy to be terrified. His testimony was confined generally to acknowledging the mother's testimony. The judge initially asked whether the father had heard his wife's testimony, and then plaintiff's counsel instructed him not "to go into anything, any duplication of what your wife has indicated." Counsel then phrased his question as to whether the father differed with his wife as to anything that took place in the physician's office, and the judge asked whether the witness' response would be similar to his wife's "or do you want to add *80 to it? Go ahead." When the father then tried to describe what the doctor was doing, as well as the boy's reaction, the trial judge twice stopped him, stating that the witness had no medical expertise. It takes no expertise to describe a doctor inserting needles into a child and the boy's screams; it requires no expert qualifications to state the father's perceived source of the boy's pain and terror. The sole basis for excluding this testimony would have been under Evid.R. 4, permitting the judge to exclude testimony if admission would "necessitate undue consumption of time." We cannot perceive that the limited responses called for would have unduly consumed trial time. While we recognize that the father's questions were also limited by his own attorney, this limitation appeared to be in obvious conformity with the trial judge's wishes. On retrial, counsel may determine whether he wishes so to limit his witness.
Plaintiff's next points raise novel issues, i.e., whether a damages jury should be told that a prior liability jury divided responsibility so that all of the damage award will not go to plaintiff and further should be informed that any award given to the minor would be held until the minor reaches the age of 18 unless a withdrawal application is approved by the surrogate or court. In Roman v. Mitchell, 82 N.J. 336, 345 (1980) the Supreme Court mandated an ultimate outcome charge, see N.J. Model Charges, Civil, 2d Ed. § 8.25, so that a jury could understand the import of its percentage allocation of fault and be "better able to fulfill its fact finding function."[4]
We see no reason to extend this principle to the case before us, nor should it generally be so extended except in extraordinary *81 circumstances. We can envision cases where elements of an injured plaintiff's negligent conduct have been placed before the jury during a damage trial. If the jury in such instances were not told that there already had been an allocation of responsibility in the prior trial and that this allocation would reduce damages, the jury might be inclined in the absence of such instructions to make their own allocation by reducing the award. Likewise, if a jury has had placed before it evidence that parents might dissipate any award for their child, the jury should be instructed that the award is held subject to the court's control until the child reaches adulthood. Such instructions would further the same purposes described in Roman v. Mitchell. These factors, however, were not present in the case before us, and we, therefore, find no error in the trial judge's declining to give extraneous instructions.
The judgment appealed from is reversed and the matter is remanded for a new trial as to damages only.
NOTES
[1] There was no motion for an interlocutory appeal after that trial nor a direct appeal here raising the issue of whether a child of five years could have been contributorily negligent. Recognizing the same standard applies to a child's affirmative or contributory negligence, Busch v. N.J. & N.Y. Transit Co. Inc., 30 N.J. 345, 358 (1959), held that a child under the age of seven is rebuttably presumed to be incapable of negligence. Busch was cited with approval by the majority in Goss v. Allen, 70 N.J. 442, 447 (1976), and Justice Schreiber in his dissent also noted that the majority was adhering to the principles of Busch. In dictum addressing the responsibility of a child of tender years, he further noted that the issue was not even "to be submitted to the jury in the absence of evidence `from which the jury could infer that the child was capable of understanding and avoiding the danger of injury involved in the circumstances of the case' 30 N.J. at 358. The party asserting the infant's negligence or contributory negligence bore the burden of proof." 70 N.J. at 453.
[2] No appeal was taken from this dismissal that presumably relied upon Foldi v. Jeffries, 93 N.J. 533 (1983). In Foldi, however, there was a direct claim only by the minor against her parents. In Fritz v. Anderson, 148 N.J. Super. 68 (Law Div. 1977), a claim similar to the one before us was asserted, but no distinction was made between a bar to the infant's claim based upon a failure of parental supervision and a bar to a claim of the parents (or either of them) for reimbursement for medical expenses not chargeable to the infant. In fact in Fritz the Law Division noted that the contribution and indemnification claims sought were "derivative in nature, dependent for the viability on the recognition of a potential claim by the infant plaintiff himself against his parents." (at 70). Since we have not been asked to review the dismissal of the third-party complaint against the mother, we here express no opinion as to whether defendant properly could have been indemnified or could have asserted contribution against the mother for the father's independent claims. Such assertion apparently would not cause a parent to be held responsible for negligent supervision of a child.
[3] Daniel had other small scars on his face from unrelated accidents.
[4] In Roman v. Mitchell, supra, the need for the ultimate outcome charge was patent. N.J.S.A. 2A:15-5.2 required a jury to find both the percentage of negligence ascribable to each party and the total damages suffered, irrespective of the percentage breakdown. Without the ultimate outcome charge uninitiated jurors could well have made incorrect assumptions as to the import of their findings.