242 N.J. Super. 574 (1990)
577 A.2d 876
TIMOTHY TRAVER, PLAINTIFF,
v.
PACKAGING INDUSTRIES GROUP, INC., DEFENDANT.
Superior Court of New Jersey, Law Division Essex County.
Decided April 9, 1990.
*575 Thomas R. Chesson for plaintiff (Porzio, Bromberg & Newman, attorneys; Kenneth R. Meyer on the brief).
James P. Richardson for defendant (Sellar, Richardson, Stuart & Chisholm, attorneys).
VILLANUEVA, J.S.C.
This products liability action arises out of an accident which occurred when a cutting blade descended on plaintiff's hand as he attempted to clear debris from machinery known as a "thermoformer." The blade came down across the middle of plaintiff's upturned palm and nearly amputated the top half of his hand. Plaintiff's hand was reattached by microsurgery.
Plaintiff's attorney, at a de bene esse deposition, indicated his intention to utilize a videotape of the surgical procedure at the *576 trial. Defendant's attorney objected to the admissibility of the videotape, contending that the lead surgeon was available to testify and the videotape would add nothing to the jury's understanding of the proofs, while it is extremely unpleasant and inflammatory.
This is a motion in limine made by defendant, pursuant to R. 4:14-9(f), to exclude at the trial the videotape of the surgical procedure under Evid.R. 4.
The court, after viewing the videotape of the surgical procedure, orally denied defendant's motion. This opinion supplements that oral decision.

I.
On February 9, 1985, plaintiff Timothy Traver's dominant hand was almost amputated by a machine manufactured by defendant Packaging Industries Group, Inc. He was taken to Bellevue Hospital where his hand was microsurgically reattached (reconstructed) by a team of surgeons headed by Bradford W. Edgerton. Coincidentally, the Bellevue Hospital microsurgery team was cooperating with a medical publishing company which was preparing a videotape for teaching purposes. A videotape crew was on call with the microsurgery crew and videotaped the surgery.
On February 13, 1990 the de bene esse videotape deposition of Edgerton was taken. Since he presently practices in California, this was the only feasible manner to obtain his testimony for trial purposes. Although the surgery took 11 hours, a 30-minute edited version of the videotape of the surgery was prepared for use at this trial. Through use of an edited version of the complete videotape, he explained the reattachment surgery that he performed. When the surgery videotape appears on the screen, Edgerton explains the surgery through questions and answers. Edgerton testified that use of the videotape in this manner was helpful to him in recalling and explaining precisely what was done during the surgery because the videotape provides a chronological detailed record.
*577 The surgery videotape can be divided into two different phases. Phase I involves the beginning and the end of the videotape. The beginning of the videotape demonstrates the injury sustained by plaintiff. There are a couple of short clips which visualize his hand before any surgery. This is almost the same view that plaintiff had of his hand shortly after he removed it from the machine and held it together against his body. The hand, which was severed across the palm, would have been completely amputated if not held together in a hinge-like fashion by the skin on the back of his hand. Shortly after plaintiff removed his hand from the machine, he looked down at it and recognized that he had a severe, crushing injury. He could see a bloody mass of bones, tendons and other internal anatomical structures. Although he probably had no idea what they were, he obviously could see them. There is no doubt that the videotape is a graphic display in color of a very unpleasant event. The other portion of phase I, at the end of the videotape shows the hand post-surgery. This is precisely what plaintiff observed for many weeks when he looked at his reattached, unbandaged hand.
Phase II of this videotape, the intraoperative section, chronicles the surgery in a step-by-step fashion, examining the repair of bones, tendons and nerves, as well as the removal of a vein in plaintiff's leg for grafting to the main artery in the hand. Edgerton indicated that all the surgery he performed was reflected in the operative record. However, the operative report does not contain a chronological list of the items of surgery, and it does not explain the details of surgery in the manner that the videotape does.
After plaintiff's hand was reattached, he had to undergo two additional surgeries, which involved a tendon transplant and a tendon transfer.

II.
Defendant contends that the surgery videotape should be excluded under Evid.R. 4 because it creates a substantial *578 danger of undue prejudice. It also argues that the videotape is cumulative evidence. However, the mere fact that photographs may be cumulative does not render them inadmissible. State v. Myers, 7 N.J. 465, 485-486, 81 A.2d 710 (1951). Relevant videotapes are generally admissible if properly authenticated. Balian v. General Motors, 121 N.J. Super. 118, 125, 296 A.2d 317 (App.Div. 1972), certif. den. 62 N.J. 195, 299 A.2d 729 (1973). The issue here is not one of authentication but one of alleged undue prejudice. In order to bar evidence under Evid.R. 4 the judge must find that the "probative value is substantially outweighed by the risk that its admission will ... create substantial danger of undue prejudice...."
Defendant's assertion that this videotape is not relevant is clearly without merit. The condition of plaintiff's hand immediately after the accident and subsequent to surgery clearly is related to his damages. Additionally, the nature of the surgery performed and the precise steps taken during surgery (including many shown under a microscope with between 10 and 40 times magnification) are probative in understanding both the surgery and the reasons for post-surgery deficits.
Edgerton's description included phrases such as "a close-up of the hand wrapped in a bloody bandage," and that it "shows an unwrapping of the bloody bandage from the hand" and "a close-up showing the depth of the injury, showing that all the muscles, bones, tendons, nerves and vessels have been cut. The only thing remaining is a bridge of dorsal skin and some veins." Later on he described a segment as a "dissection deep into the palm of the hand to identify the bone ends and to prepare them for repair." These statements are not inflammatory. His description of the surgery which he performed was very factual, illuminating and informative.
"One picture is worth more than ten thousand words." Chinese proverb.
What emphasizes the relevance and probative value of the videotape was the end of the procedure when the surgeons used *579 a pin to obtain blood from plaintiff's finger to know whether the blood was circulating to determine whether the operation was a "success." Viewing the instruments used, the veins being attached, all the tendons being reattached, the suturing and the wires was very descriptive, and the probative value far outweighs any possible prejudicial effect.
The admission of photographs having some probative value, even where cumulative and somewhat inflammatory, rests within the discretion of the trial judge. State v. Thompson, 59 N.J. 396, 420-421, 283 A.2d 513 (1971). In State v. Belton, 60 N.J. 103, 286 A.2d 78 (1972), the Court held that it was within the discretion of the trial judge to admit into evidence four color photographs of the decedent's body because they showed entrance and exit wounds of bullets fired by the defendant. Id. at 109, 286 A.2d 78.
State v. Thompson, supra, establishes the criteria which an objecting party must meet in order to exclude photographs or videotapes. Evidence claimed to be unduly prejudicial can be excluded only where its "probative value is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation...." 59 N.J. at 421, 283 A.2d 513. In Thompson, the court admitted into evidence posed photographs of a bloody corpse.
In upholding the admission into evidence of a four-minute videotape depicting the recovery of the victim's body from a buried sealed barrel and the barrel itself, the Appellate Division held that the trial judge did not "abuse the broad discretion he had in admitting these items despite their `emotional stirring' quality." State v. Grunow, 199 N.J. Super. 241, 253, 488 A.2d 1098 (App.Div. 1985), aff'd 102 N.J. 133, 506 A.2d 708 (1986), citing State v. Thompson, supra.
The Appellate Division has upheld the introduction into evidence of pictures of a murder victim which the court itself termed "ghastly." State v. Micheliche, 220 N.J. Super. 532, *580 545, 533 A.2d 41 (App.Div. 1987). The court determined that the emotional stirring and the cumulative nature of these pictures did not render them inadmissible. Similarly, a photograph of a corpse "bare from the groin up and [showing] the point of entrance of two bullets" was deemed admissible as it "did have probative value and was not unduly inflammatory." State v. Royster, 57 N.J. 472, 485, 273 A.2d 574 (1971), cert. den. 404 U.S. 910, 92 S.Ct. 235, 30 L.Ed.2d 182 (1971).
In State v. Sanchez, 224 N.J. Super. 231, 249-250, 540 A.2d 201 (App.Div. 1988), certif. den. 111 N.J. 653, 546 A.2d 561 (1988), the court permitted into evidence photographs showing "close-ups of the gunshot [shotgun] wounds of the victim's hand, chest cavity and face" over objections that the "pictures were either not relevant or cumulative evidence and that the probative value is outweighed by the prejudicial effect." The court found that the photographs were admissible as they related to defendant's state of mind. The photographs in the Micheliche, Royster and Sanchez cases were all graphic and gruesome. In each case, they were arguably cumulative as either police officers or medical examiners could have testified as to the nature of the wounds. Despite this fact they were allowed into evidence in each case as they were "legitimately a part of the [plaintiff's] proof." Micheliche, supra, 220 N.J. Super. at 545, 533 A.2d 41.
Phase I of the videotape is the only evidence which fairly demonstrates the severity of this injury presurgery and the condition of plaintiff's hand postsurgery. There are no other proofs which can show what plaintiff saw when he looked down at his hand after removing it from the machine. There is likewise no other proof which can adequately show the condition of his hand as he experienced it and observed it daily after the surgery. Phase I does not have "a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation"; it has precisely the opposite effect. State v. Thompson, supra, 59 N.J. at 421, 283 A.2d 513. Viewing phase I would afford the jurors the opportunity to see what plaintiff *581 saw after the accident and after the surgery. There is no other way to adequately explain this to the jury. Nothing could be more relevant to damages in a personal injury case than a videotape of the injury as it appeared at the time of occurrence.
The Appellate Division reversed, as an abuse of discretion, a ruling which excluded from evidence, photographs of plaintiff's scar, because plaintiff was in court to testify. Chavanne by Chavanne v. Clover Financial Corp., 206 N.J. Super. 72, 501 A.2d 1024 (App.Div. 1985). The court held that the photographs depicted the scar in an earlier condition and were necessary to show the progress of the scar. Id. at 79, 501 A.2d 1024. The same rationale applies here. Listening to testimony, viewing plaintiff's hand at trial, or even looking at photographs of the injury, do not adequately demonstrate the injury. While photographs are an appropriate medium for documenting a scar, which is essentially two dimensional, a videotape is the appropriate medium for demonstrating an amputation injury, which is three dimensional. Another trial court employed this logic in admitting into evidence color slides of a victim in the hospital after an accident. "[T]he relevance of the injuries to [plaintiff] as depicted in the slides was manifestly relevant to the issue of damages." Lamendola v. Mizell, 115 N.J. Super. 514, 526, 280 A.2d 241 (Law Div. 1971).
Phase II of the videotape assisted the doctor in testifying and will clearly aid the jury in understanding this complicated surgery. Edgerton's ability to describe the operation was significantly enhanced by the fact that he could refer to the videotape for demonstrative purposes. The court believes that he could not have been as precise without it. Courts have held that where a videotape can aid an expert's testimony, it can appropriately be admitted into evidence. Slakan v. Porter, 737 F.2d 368, 378 (4 Cir.1985), cert. den. 470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985). Edgerton was able to demonstrate, by narrating the videotape, precisely how microsurgery is done and how it was done in this case. The court viewed the videotape and found it to be probative and illuminating. The *582 jury can observe such things as the Kirschner wires and understand precisely what they are and what they do. They will understand why plaintiff was left with wires protruding from all of his knuckles after the surgery. It would be extremely difficult to understand the complex aspects of this surgery through verbal testimony alone.
In State v. Polk, 164 N.J. Super. 457, 397 A.2d 330 (App.Div. 1977) the court said:
S-23 in evidence is a photograph of decedent taken shortly after the crime indicating a featureless face covered with blood. It is unquestionably gruesome and potentially inflammatory. The State argued, and the judge admitted it on the theory that the photograph indicated the severity and intensity of the attack and was corroborative of the State's contention that the killing was willful, deliberate and premeditated. [Id. at 464, 397 A.2d 330]
Although there is no direct similarity between that case and this one, there is an indirect one because, in the court's judgment, this videotape is the best indication of the severity of the injury, the reason for the extensive surgery taking 11 hours, and the potentially unsuccessful result of the operation, because plaintiff now has only 50 percent use of his hand.
Some of plaintiff's current deficits relate to the manner in which the repair had to be accomplished. For instance, his hand is permanently partially flexed, in part because of the fact that tendons and other anatomical features had to be trimmed before they were sutured.
The court has permitted the admission in evidence of a film of a patient in the hospital, Jastremski v. General Motors Corp., 109 N.J. Super. 31, 262 A.2d 218 (App.Div. 1970), despite the fact that someone could have offered testimony relating its content. Id. at 39, 262 A.2d 218.

III.
Defendant's claim that this evidence is prejudicial is tantamount to stating that it is damaging. However, prejudice alone is not adequate to exclude evidence under Evid.R. 4 because all damaging evidence is prejudicial. State v. Bowens, 219 N.J. Super. 290, 297, 530 A.2d 338 (App.Div. 1987). To justify exclusion *583 a party must show "undue prejudice." Cases which have excluded evidence because the probative value is substantially outweighed by undue prejudice have usually turned on the fact that the evidence had virtually no probative value. State v. Medina, 201 N.J. Super. 565, 580-581, 493 A.2d 623 (App.Div. 1985), certif. den. 102 N.J. 298, 508 A.2d 185 (1985). Burd v. Vercruyssen, 142 N.J. Super. 344, 354-355, 361 A.2d 571 (App. Div. 1976), certif. den. 72 N.J. 459, 371 A.2d 64 (1976).
The surgery videotape is clearly probative because it allows the jury to comprehend, in the only manner possible, the true extent of plaintiff's injury and the significant and complicated surgery required to salvage his hand. It is virtually impossible to comprehend this surgery without viewing the videotape. The jury should not be denied the opportunity to see this videotape simply because defendant believes that the videotape is "extremely unpleasant and inflammatory in nature."
Motion denied.