670 A.2d 516

JERRY FISCHER, ADMINISTRATOR AND ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF RACHEL FISCHER, DECEASED, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. ARTHUR T. CANARIO, M.D., DEFENDANT–APPELLANT AND CROSS–RESPONDENT, AND NORMAN MAGID, M.D. AND JOHN DOES 1 THROUGH 5, DEFENDANTS.

Argued October 23, 1995—Decided January 30, 1996.

*Hugh Francis* argued the cause for appellant and cross-respondent (*Francis & Berry,* attorneys; *Peter A. Olsen,* on the briefs).

*Thomas R. Chesson* argued the cause for respondent and cross-appellant (*Porzio, Bromberg & Newman,* attorneys; *William A. Krais,* on the briefs).

The opinion of the Court was delivered by

GARIBALDI, J.

The primary issue in this appeal is the scope of the prospective application of the damage-apportionment rule announced by the Court in *Scafidi v. Seiler,* 119 *N.J.* 93, 574 *A.*2d 398 (1990). Also at issue is whether the trial court erred in refusing to give the jury an "ultimate outcome" charge.

## I

On October 11, 1984, Rachel Fischer, then sixty-one years old, went to the emergency room of Newark Beth Israel Medical Center (Beth Israel) as a result of a fall. Dr. Arthur T. Canario, an orthopedic surgeon, examined an x-ray of her shoulder, diagnosed her injury as a fracture, applied a sling, administered medication for her pain, and told her to go home and make an appointment for a follow-up visit. However, Mrs. Fischer requested that she be admitted for the night, because she would be alone at her residence. Dr. Canario reluctantly admitted her and was listed as her attending physician, although he did not treat her after her admission. Mrs. Fischer left the hospital the next morning.

Pursuant to hospital procedure for admitted patients, an x-ray was taken of Mrs. Fischer's chest. Based on that x-ray, Dr. Norman Magid, a radiologist, prepared a report that indicated a probable tumor. Some time thereafter, that report was attached to the x-ray and placed in Mrs. Fischer's hospital chart. Dr. Canario was not aware of that report. Because Dr. Canario was listed as her attending physician, he was required to sign her chart, which he did approximately one week after Mrs. Fischer had been discharged from the hospital. Although he looked through the records attached to Mrs. Fischer's chart, he saw neither the x-ray nor the radiological report. According to Dr. Canario, they were not attached to her chart at that time because "it took a long time for x-ray reports to come back to the chart. It'd be highly unlikely it would be back in a week." Thereafter, Dr. Canario examined her bone fracture several times, but said nothing about her probable tumor, of which he was unaware.

In June 1987, Mrs. Fischer was diagnosed as suffering from metastatic lung cancer. After undergoing radiation therapy and two cycles of chemotherapy, and suffering from, among other things, brain seizures, she died on February 16, 1988.

In April 1989, Jerry Fischer, Mrs. Fischer's son and the administrator and administrator *ad prosequendum* of Mrs. Fischer's

estate, sued Dr. Canario and Dr. Magid for medical malpractice. The trial commenced on March 18, 1993. At trial, Jerry Fischer testified about his mother's extensive physical suffering stemming from the cancer, including her severe nausea, loss of appetite, and general weakness. He also described the severe emotional repercussions of her chemotherapy treatment. As she lost her hair, Mrs. Fischer, a Holocaust survivor, began to relive her concentration camp experiences. Scars and bumps, hidden for years by her hair, were revealed and served as constant reminders of her World War II experiences.

Frank Tinari, an economist, testified for the plaintiff that Mrs. Fischer's children and grandchildren sustained a loss of over $100,000 by being deprived of Fischer's advice, guidance, and counsel during the period between her actual death and her statistical date of death (2006). He further testified that the children and grandchildren sustained a loss of over $44,000 due to loss of companionship. Based on testimony of Fischer's son and daughter, Tinari stated that the children had also lost the opportunity to receive gifts totalling approximately $30,000. The parties stipulated to medical expenses of $45,000 and funeral expenses of $5,000.

Plaintiff presented expert testimony that the prevailing standard of reasonable medical care required a patient's attending physician, prior to signing a patient's chart, to know the tests performed on his or her patient and the results of those tests. There was testimony that Dr. Canario's failure to review the chest x-ray and inform Mrs. Fischer of the probable tumor was a "substantial factor in causing [her] to lose her 50 percent chance of a cure which she had as of October 11, 1984." The parties stipulated, and the trial court informed the jury, that if the cancer had been diagnosed in October 1984, Mrs. Fischer would have had a fifty percent chance of survival. The trial court, however, rejected plaintiff's request to include an ultimate outcome charge in the instructions to the jury.

The jury found that Dr. Canario, but not Dr. Magid, had been negligent, and awarded plaintiff a total of $134,231 in damages, $96,687 on the decedent's survivorship claim and $37,544 for the wrongful-death claim. Initially, the trial court determined that the damage-apportionment rule announced in *Scafidi, supra,* applied to this case and reduced the verdict from $134,231 to $67,115. After the trial, plaintiff moved for an additur, or alternatively for a new trial. The trial court denied both motions. However, in response to those post-trial motions the trial court reversed its initial ruling on the application of *Scafidi.* Although the court believed that the *Scafidi* rule should apply because "it was a rule of equity," it concluded that based on the Appellate Division's interpretation of *Scafidi*'s prospectivity in *Roses v. Feldman,* 257 *N.J.Super.* 214, 608 *A.*2d 383 (1992), *Scafidi* did not apply. The court therefore reinstated the $134,231 verdict.

Both parties appealed to the Appellate Division. Dr. Canario argued that a judgment notwithstanding the verdict should have been entered in his favor because the evidence failed to establish that he had a duty to inform Mrs. Fischer about her chest x-ray, and further, that if the verdict were sustained it should be reduced because the *Scafidi* damage-apportionment rule was applicable. Plaintiff cross-appealed from the judgment contending that the trial court's denial of his request for an ultimate outcome charge was prejudicial error.

In considering the *Scafidi* issue, the Appellate Division observed that in this case the negligence (October 1984), the accrual of the wrongful-death cause of action (February 1988), and the filing of the complaint (April 1989) occurred prior to the *Scafidi* decision (May 24, 1990). The trial, however, commenced in March 1993, and judgment was entered in May 1993. The Appellate Division "infer[red] that the prospective application of [*Scafidi*'s] damage rule was intended to apply only to causes of action which accrued after the date the Supreme Court issued its *Scafidi* opinion." 277 *N.J.Super.* 302, 310, 649 *A.*2d 875 (1994). The court emphasized that it had been "attempting only to interpret the

prospectivity rule announced in *Scafidi*. Because the Supreme Court declared that *Scafidi* should be applied only prospectively, we do not consider ourselves free to decide on policy grounds whether or not it should be applicable to a medical malpractice case like the present one." *Id.* at 310 n. 1, 649 *A.*2d 875. Therefore, the Appellate Division concluded that the trial court properly declined to apply *Scafidi* and the verdict remained $134,231. The Appellate Division rejected plaintiff's ultimate outcome charge argument.

We granted defendant's petition for certification, 142 *N.J.* 449, 663 *A.*2d 1357 (1995), to review the Appellate Division's prospective application of the damage-apportionment rule announced in *Scafidi v. Seiler*, 119 *N.J.* 93, 574 *A.*2d 398 (1995). Subsequently, we granted plaintiff's cross-petition, 142 *N.J.* 516, 665 *A.*2d 1109 (1995), to review whether the trial court erred in not providing an ultimate outcome charge to the jury.

## II

In *Scafidi, supra,* we reaffirmed the standard that we initially announced in *Evers v. Dollinger*, 95 *N.J.* 399, 471 *A.*2d 405 (1984). We held that when evidence demonstrates within a reasonable degree of medical probability that negligent medical treatment increased the risk of harm posed to a patient by a preexisting condition, a jury question is raised concerning whether the increased risk was a substantial factor in producing the ultimate result. *Scafidi, supra,* 119 *N.J.* at 108, 574 *A.*2d 398. The Court further held that "[t]o the extent that a plaintiff's ultimate harm may have occurred solely by virtue of a preexisting condition, without regard to a tortfeasor's intervening negligence, the defendant's liability for damages should be adjusted to reflect the likelihood of that outcome." *Id.* at 112–13, 574 *A.*2d 398. Accordingly, the jury must determine that likelihood on a "percentage basis," and the trial court must "mold the verdict to limit defendant's liability to the value of the lost chance for recovery attribut-

able to defendant's negligence." *Id.* at 114, 574 *A.*2d 398. Finally, the Court concluded:

> In view of the significant change in the law represented by our holding concerning the measure of damages, the effect and application of that holding, except with respect to this case and *Olah v. Slobodian,* 119 *N.J.* 119, 574 *A.*2d 411 (1990), also decided today, shall be prospective only. *See Weinberg v. Dinger,* 106 *N.J.* 469, 524 *A.*2d 366 (1987).
>
> [*Ibid.* ]

However, we did not interpret the scope of the prospective application of the *Scafidi* rule. We turn to that interpretation now.

As expected, the parties take opposing positions as to what the Court meant by "prospective." Plaintiff asserts that the Court intended *Scafidi* to apply only to cases whose causes of action accrued after May 24, 1990, the date this Court issued the *Scafidi* opinion. Defendant asserts that the Court intended *Scafidi* to apply only to cases tried after May 24, 1990, as opposed to cases that were pending when *Scafidi* was decided.

The case law that has addressed *Scafidi* 's prospectivity application offers little guidance. The trial court relied on *Roses v. Feldman,* 257 *N.J.Super.* 214, 608 *A.*2d 383 (App.Div.1992), a medical malpractice case in which the court declined to apply the *Scafidi* rule. The *Roses* court stated that "[t]he effect of *Scafidi* . . . on damages, that is to say, the limitation on damages to reflect the lost chance attributable to the defendant's negligence was explicitly made prospective only." *Id.* at 219, 608 *A.*2d 383 (citation omitted). Although the cause of action in *Roses* accrued before *Scafidi* was decided, the court could not ascertain when the case was tried and decided.

We agree with the Appellate Division's conclusion that the other case law addressing *Scafidi* 's prospectivity requirement, namely, *Lanzet v. Greenberg,* 126 *N.J.* 168, 594 *A.*2d 1309 (1991), "does not provide . . . clear guidance on the meaning of *Scafidi* 's prospectivity rule." 277 *N.J.Super.* at 309, 649 *A.*2d 875. In *Lanzet, supra,* a medical malpractice case, the original trial, as well as the retrial and disposition of the retrial by the Appellate Division, *see Lanzet*

*v. Greenberg,* 243 *N.J.Super.* 218, 579 *A.*2d 309 (decided Jan. 19, 1990), occurred prior to this Court's decision in *Scafidi.* The Court in *Lanzet, supra,* held that the trial court improperly failed to "require the jury to determine whether the physicians' neglect increased the risk of harm to the patient and whether that increased risk was a substantial factor in producing her injuries." 126 *N.J.* at 188, 594 *A.*2d 1309 (citing *Evers, supra* ). The Court continued: "We have the inestimable benefit of hindsight in assessing the merits of this case. In our 1990 decisions in [*Scafidi* and *Olah* ] we prospectively limited recovery in such circumstances to the value of the 'lost chance' attributable to the physician's neglect." *Ibid.* (citations omitted). In dissent, Justice Pollock critiqued the majority for "ignoring" *Scafidi* 's "prospective-only application of the increased risk damage analysis." *Id.* at 207, 594 *A.*2d 1309 (Pollock, J., dissenting).

### III

Courts are constantly struggling with the task of determining the degree to which a new rule should be applied retroactively or prospectively. As far back as 1940 Chief Justice Charles Evans Hughes lamented that questions of retroactivity were "among the most difficult" problems that engage the attention of both federal and state courts. *See Chicot County Drainage Dist. v. Baxter State Bank,* 308 *U.S.* 371, 374, 60 *S.Ct.* 317, 319, 84 *L.Ed.* 329, 333 (1940); *Rutherford Educ. Ass'n v. Rutherford Bd. of Educ.,* 99 *N.J.* 8, 21, 489 *A.*2d 1148 (1985); *Coons v. American Honda Motor Co., Inc.,* 96 *N.J.* 419, 425, 476 *A.*2d 763 (1984) (*Coons II* ), *cert. denied,* 469 *U.S.* 1123, 105 *S.Ct.* 808, 83 *L.Ed.*2d 800 (1985).

This Court has generally adhered to the traditional rule of jurisprudence that the overruling of past precedent is retrospective in nature. *Darrow v. Hanover Tp.,* 58 *N.J.* 410, 413, 278 *A.*2d 200 (1971); *see also Rutherford, supra,* 99 *N.J.* at 21, 489 *A.*2d 1148; *Coons II, supra,* 96 *N.J.* at 439, 476 *A.*2d 763; *Busik v. Levine,* 63 *N.J.* 351, 360–61, 307 *A.*2d 571 *app. dism.,* 414 *U.S.* 1106, 94 *S.Ct.* 831, 38 *L.Ed.*2d 733 (1973); *Wangler v. Harvey,* 41

N.J. 277, 287, 196 A.2d 513 (1963); *Fox v. Snow,* 6 N.J. 12, 14, 76 A.2d 877 (1950); *Cogliati v. Ecco High Frequency Corp.,* 181 N.J.Super. 579, 582, 439 A.2d 91 (App.Div.1981), *aff'd,* 92 N.J. 402, 456 A.2d 524 (1983). However, "[s]ound policy grounds may justify limiting the retroactive effect...." *Mirza v. Filmore Corp.,* 92 N.J. 390, 397, 456 A.2d 518 (1983).

This Court has held that in determining whether to apply a new rule prospectively or retroactively a court may follow one of four options:

> (1) make the new rule of law purely prospective, applying it only to cases whose operative facts arise after the new rule is announced; (2) apply the new rule to future cases and to the parties in the case announcing the new rule, while applying the old rule to all other pending and past litigation; (3) grant the new rule limited retroactivity, applying it to cases in (1) and (2) as well as to pending cases where the parties have not yet exhausted all avenues of direct review; and, finally, (4) give the new rule complete retroactive effect, applying it to all cases, even those where final judgments have been entered and all avenues of direct review exhausted.
>
> [*State v. Burstein,* 85 N.J. 394, 402–03, 427 A.2d 525 (1981) (citing *State v. Nash,* 64 N.J. 464, 468–70, 317 A.2d 689 (1974)).]

■ In assessing which option to choose, a court's decision is guided by "what is just and consonant with the public policy considerations in the situation presented." *Rutherford, supra,* 99 N.J. at 22, 489 A.2d 1148; *see also Accountemps Div. of Robert Half of Philadelphia, Inc. v. Birch Tree Group, Ltd.,* 115 N.J. 614, 628; 560 A.2d 663 (1989) ("The primary concern with retroactivity questions is with 'considerations of fairness and justice, related to reasonable surprise and prejudice to those affected.'") (quoting *New Jersey Election Law Enforcement Comm'n v. Citizens to Make Mayor–Council Gov't Work,* 107 N.J. 380, 388, 526 A.2d 1069 (1987)).

■ The question of the scope of the prospective application of the *Scafidi* damage-apportionment rule "is not answered by any constitutional mandate." *State v. Nash,* 64 N.J. 464, 470, 317 A.2d 689 (1974). Rather, the competing considerations in each case are weighed by examining the following three factors: (1) the purpose of the new rule and whether it would be advanced by retroactive

application; (2) the reliance placed on the old rule by the parties and the community; and (3) the effect that retroactive application would have on the administration of justice. *Rutherford, supra,* 99 *N.J.* at 22, 489 *A.*2d 1148 (citing *State v. Burstein, supra,* 85 *N.J.* at 406, 427 *A.*2d 525). The United States Supreme Court has recommended a similar set of factors. *Chevron Oil Co. v. Huson,* 404 *U.S.* 97, 106–07, 92 *S.Ct.* 349, 355, 30 *L.Ed.*2d 296, 306 (1971).

Depending on the facts of a case, any one of those three factors may be pivotal. *Rutherford, supra,* 99 *N.J.* at 23, 489 *A.*2d 1148. For example, the first factor, whether the purpose of the new rule would be advanced by retroactive application, is pivotal in cases where the new rule is an exclusionary rule of evidence. *Ibid.* In such a situation, the rule is rarely given retroactive effect, since "the deterrent purposes of such a rule would not be advanced by applying it to past misconduct." *State v. Burstein, supra,* 85 *N.J.* at 406, 427 *A.*2d 525. *See State v. Catania,* 85 *N.J.* 418, 446–47, 427 *A.*2d 537 (1981); *State v. Carpentieri,* 82 *N.J.* 546, 549, 414 *A.*2d 966 (1980); *State v. Howery,* 80 *N.J.* 563, 569, 404 *A.*2d 632, *cert. denied,* 444 *U.S.* 994, 100 *S.Ct.* 527, 62 *L.Ed.*2d 424 (1979).

In other cases the determinative factor is the reliance placed on the old rule by the parties and the community. *Rutherford, supra,* 99 *N.J.* at 23, 489 *A.*2d 1148; *Coons II, supra,* 96 *N.J.* at 440, 476 *A.*2d 763; *Salorio v. Glaser,* 93 *N.J.* 447, 461 *A.*2d 1100, *cert. denied,* 464 *U.S.* 993, 104 *S.Ct.* 486, 78 *L.Ed.*2d 682 (1983). For example, in *New Jersey Bd. of Higher Educ. v. Shelton College,* 90 *N.J.* 470, 490, 448 *A.*2d 988 (1982), this Court enjoined an unlicensed college from granting degrees but allowed the school to award credits and degrees to junior and senior students in recognition of the students' pursuit of educational goals in good faith reliance on the credibility of the institution. Similarly, in *Salorio, supra,* despite this Court's declaration that the Emergency Transportation Tax Act, *N.J.S.A.* 54:8A–1 to –57, was unconstitutional, this Court applied the decision prospectively because of the State's reliance on the taxing statute as a significant source of revenue contributing to the solution of the State's fiscal problems.

93 *N.J.* at 467, 461 *A.2d* 1100. *See also Passaic v. Local Fin. Bd.,* 88 *N.J.* 293, 303, 441 *A.2d* 736 (1982) (holding that despite municipality's possible lack of good faith in adopting emergency appropriation request in violation of *N.J.S.A.* 40A:4–46, Court would not review appropriation because expenditures in reliance thereon could not be undone).

In other cases, we examined the effect that the new rule would have on the effective administration of justice, the third factor. In *State v. Burstein, supra,* 85 *N.J.* at 410, 427 *A.2d* 525, we held that even limited retroactive application of the rule announced in *State v. Cerbo,* 78 *N.J.* 595, 397 *A.2d* 671 (1979), namely, that a delay in presenting tapes of intercepted conversations for sealing requires suppression unless there was satisfactory explanation for delay, would inflict "virtually incalculable" costs on our administration of justice. *See also State v. Catania, supra,* 85 *N.J.* at 447, 427 *A.2d* 537 (holding that rule announced excluding the results of a wiretap because of improper minimization should not be applied retroactively because to reopen cases, even on a limited basis, for detailed hearings on the reasonableness of the interception of each phone call during each wiretap would overwhelm the courts).

## IV

Any prospectivity decision necessarily involves questions of public policy and basic notions of judicial fairness. *Rutherford, supra,* 99 *N.J.* at 22, 489 *A.2d* 1148. For example, as a matter of public policy, to encourage litigants to challenge common law doctrines, courts often apply the new rule only to future cases and to the litigants whose efforts forged the development of the new legal rule. *Darrow, supra,* 58 *N.J.* at 420, 278 *A.2d* 200. This "limited prospective approach" was applied in *Darrow,* where we held that the abrogation of interspousal tort immunity in automobile negligence actions should be applied only to the litigants in that case and to persons suffering injuries after the date the new rule was announced. *Ibid. See also Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 449, 625 *A.2d* 1110 (1993) (applying newly

recognized duty for real-estate brokers to inspect and warn persons who tour open house, except to parties, to events occurring after date of decision); *Cogliati, supra,* 92 *N.J.* at 417, 456 *A.*2d 524 (applying new rule extending liability of predecessor in title for maintenance of public sidewalks, except to parties, to accidents occurring after date of decision "because of the additional element of insurance involved in the predecessor-in-title framework").

Because of public policy and fairness, courts often have applied a new rule of law to all pending and future cases. For example, in *Mirza v. Filmore Corp.,* 92 *N.J.* 390, 400, 456 *A.*2d 518 (1983), we announced a new rule—that commercial landowners were responsible for maintaining public sidewalks abutting their property in reasonably good condition and were liable to pedestrians injured as a result of their negligent failure to do so. We applied that new rule to pending litigation and to actions that were not instituted and were not barred by the statute of limitations, because "on balance the reasons for retroactivity tip the scales in its favor because an innocent party who suffers serious injuries as a result of sidewalk defects should not be left without measure." *Id.* at 397, 456 *A.*2d 518. Similarly, in *Ramirez v. Amsted Industries, Inc.,* 86 *N.J.* 332, 431 *A.*2d 811 (1981), this Court, as a matter of public policy and fairness, held that a new rule of strict products liability should be applied to the litigants before the court and also to those similarly situated plaintiffs whose claims were pending at the time the Appellate Division announced the new rule. We reasoned that although "there was a reasonable basis for reliance by successor corporations and their insurance carriers" on the former nonliability rule, the new rule "on balance and as a matter of fundamental fairness" should be applied to similarly situated plaintiffs. *Id.* at 357, 431 *A.*2d 811. We observed that "[t]here is a basic justice in recognizing that persons who have exercised the initiative to challenge the existing law should be accorded relief if their claims—not yet resolved when the new rule of law is announced—are ultimately vindicated." *Ibid. See also Rutherford, supra,* 99 *N.J.* at 28–29, 489 *A.*2d 1148 (applying tenure rule announced in *Spiewak v. Rutherford Bd. of Educ.,* 90

*N.J.* 63, 447 *A*.2d 140 (1982), on basis of fundamental fairness, to teachers who had instituted action with Commissioner of Education based on right to tenure prior to date of *Spiewak* decision because "[t]he teachers in these actions were diligent in pursuing their claims of tenure status" and "[h]ad these cases been heard before *Spiewak*, the teachers here would presumably have been given the benefit of our holding in that case").

Limited prospectivity is particularly appropriate where the new rule of law does not create a new legal duty. In *Jacober v. St. Peter's Medical Center*, 128 *N.J.* 475, 608 *A*.2d 304 (1992), this Court adopted the Federal Rule of Evidence that permits the use of learned treatises for substantive purposes. We stated that the new rule was to be applied prospectively, except for that case. *Id.* at 498, 608 *A*.2d 304. Two years later in *Adamski v. Moss*, 271 *N.J.Super.* 513, 638 *A*.2d 1360 (App.Div.1994), the Appellate Division examined the prospective application of the *Jacober* rule. In *Adamski, supra,* a medical malpractice plaintiff had her case dismissed for failure to supply live expert testimony, despite her claim that she was entitled to introduce medical texts in lieu of live testimony pursuant to *Jacober.* The Appellate Division agreed with the plaintiff's understanding of the meaning of the prospectivity language in *Jacober*:

> The rule in *Jacober,* and the substantially equivalent *N.J.R.E.* 803(c)(18), applies to the trial of cases, not to a commencement of the cause of action. Prospective application of the learned treatise rule, therefore, refers to trials that take place after July 8, 1992, [the date *Jacober* was decided] not to causes of actions arising after that date.

> [*Adamski, supra,* 271 *N.J.Super.* at 518, 638 *A*.2d 1360.]

*Cf. Cogdell v. Hospital Center at Orange*, 116 *N.J.* 7, 28, 560 *A*.2d 1169 (1989) (applying mandatory party-joinder rule prospectively and to all cases not already on appeal because decision invoked Court's "rulemaking, as well as [its] adjudicatory authority, [and therefore] fairness to plaintiff and others similarly situated impels us to follow the rule of prospectivity normally applied to legislative pronouncements").

## V

■ Applying the three critical factors—public policy, reliance, and effect on the administration of justice—it is evident that the first factor is pivotal in determining the degree of prospectivity that should attach to the *Scafidi* damage-apportionment rule in this case.

In *Scafidi, supra,* this Court declared:

[A] rule that limits a plaintiff's damages in *Evers* [*v. Dollinger,* 95 *N.J.* 399, 471 *A*.2d 405 (1984)]-type cases to the value of the lost chance of recovery is an essential complement to *Evers'* modification of the proof required to establish proximate causation. It should be a self-evident principle of tort law that valuation of allowable damages "is animated by a premise similar to that underlying causation: that a tortfeasor should be charged only with the value of the interest destroyed."

[119 *N.J.* at 112, 574 *A*.2d 398 (quoting King, *Causation, Valuation and Chance in Personal Injury Torts Involving Preexisting Conditions and Factual Consequences,* 90 *Yale L.J.* 1353, 1355 (1981))].

*Scafidi* merely clarified what was implicit in *Evers,* namely, that damage apportionment is an essential complement of *Evers'* increased risk theory. Failure to apply the *Scafidi* rule to the *Evers'* increased risk rule would be fundamentally unfair. The *Scafidi* damage-apportionment rule was designed to correct the unjust result of saddling a defendant physician with the costs of injuries resulting from a preexisting condition. Principles of fundamental fairness dictate that a physician's liability in a medical malpractice action be limited to the value of lost chance for recovery attributable to the physician's negligence. *Scafidi, supra,* 119 *N.J.* at 112–13, 574 *A*.2d 398.

Moreover, the rule also "serves an important societal interest in the context of medical-malpractice litigation. A rule of law that more precisely confines physicians' liability for negligence to the value of the interest damaged should have a salutary effect on the cost and availability of medical care." *Id.* at 113, 574 *A*.2d 398. A purely prospective application of the *Scafidi* damage-apportionment rule would clearly frustrate the purpose of that decision. It would violate both public policy and the principle of fundamental fairness.

Although we acknowledged in *Scafidi, supra,* 119 *N.J.* at 114, 574 *A.*2d 398, that the damage-apportionment rule represented a significant change in the law, we nonetheless agree with defendant that the rule was foreshadowed by *Fosgate v. Corona,* 66 *N.J.* 268, 330 *A.*2d 355 (1974) and *Evers.* Apportionment of damages was already a well settled principle of law applicable to malpractice cases involving the aggravation of a preexisting condition when *Scafidi* was decided. *See Fosgate, supra; Evers, supra.* Therefore, *Scafidi*'s application of that rule to increased risk cases was not unexpected. Indeed in *Evers, supra,* we anticipated what the appropriate measure of damages would be in increased risk cases and we set forth the exact apportionment rule we adopted in *Scafidi:*

> One commentator suggests that the increased risk need not be quantified in order to calculate compensation for the *loss* of the chance of surviving. King, *Causation, Valuation & Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences,* 90 *Yale L.J.* 1353 (1981). His illustrations reveal, however, that the harm for which he advocates redress is not the increased risk *per se,* but rather a harm such as death or bodily injury occasioned in part by the increased risk. A patient who dies from a heart attack, writes King, would have a cause of action against the physician who misdiagnosed the condition, even though the patient would have had only a 40% chance of survival with timely diagnosis. King would award compensation equal to 40% of the value of the victims life had he lived. *Id.* at 1382.
>
> [95 *N.J.* at 412, n. 7, 471 *A.*2d 405].

The *Scafidi* rule does not recognize a new cause of action or eliminate a plaintiff's cause of action. It merely limits the amount that a plaintiff can recover under his or her cause of action. It does not abrogate any immunity or necessitate the procurement of additional insurance. The *Scafidi* damage-apportionment rule does not cause persons to modify their behavior in any significant manner. Generally, the element of reliance is less important in tort law than in other areas of law. *Mirza, supra,* 92 *N.J.* at 398, 456 *A.*2d 518. Justice Proctor wrote in *Darrow, supra,* that "reliance has very little place in the field of torts so far as it affects the negligence itself; persons do not generally regulate their conduct because they will or will not be liable in negligence." 58 *N.J.* at 415, 278 *A.*2d 200.

Retroactive application of the *Scafidi* rule would not be unjust to plaintiff. Application of the damage-apportionment rule does not upset any reliance interest and neither party can show that they would be unfairly prejudiced by the application of the rule. Applying the *Scafidi* damage-apportionment rule to cases tried after the date of the *Scafidi* opinion would not necessitate any retrials. Therefore, application of the *Scafidi* rule comports with the third factor, administrative efficiency.

Weighing the three factors, we hold that the damage rule announced in *Scafidi* on May 24, 1990 should apply to cases tried after the date of that opinion. The purpose of the *Scafidi* rule is to limit a plaintiff's damages to the value of the lost chance of recovery. To allow full recovery for all of plaintiff's damages against a medical provider whose negligence caused plaintiff only a lost chance of recovery is fundamentally unfair. *Scafidi*'s purpose was to restore a sense of fairness to lost-chance cases. A purely prospective application of *Scafidi* would clearly frustrate that purpose.

## VI

Also at issue is whether the trial court erred in refusing to give the jury an ultimate outcome charge. *See Roman v. Mitchell,* 82 *N.J.* 336, 413 *A.*2d 322 (1980). Defendant does not contest the proposition that in cases governed by *Scafidi* an ultimate outcome charge is generally appropriate. Instead, he asserts that any error in not giving the charge was harmless. We disagree.

The primary justification for giving a jury an ultimate outcome charge is that it informs the jury about the impact of its decision. In *Roman, supra,* we stated "that a jury in a comparative negligence situation should be given an ultimate outcome charge so that its deliberations on percentages of negligence will not be had in a vacuum, or possibly based on a mistaken notion of how a statute operates." 82 *N.J.* at 345, 413 *A.*2d 322. We emphasized that "a jury informed of the legal effects of its findings ... is better able to fulfill its fact finding function." *Id.* at 345–46, 413

A.2d 322. *See also State v. Mejia*, 141 *N.J.* 475, 485, 662 *A.2d* 308 (1995) ("As we have repeatedly stated, trial courts ... must inform juries of the effect of their findings.") (citations omitted); *Campo v. Tama*, 133 *N.J.* 123, 140, 627 *A.2d* 135 (1993) ("We have always emphasized that juries must understand the import of their findings.") (O'Hern, J., dissenting); *Chavanne v. Clover Financial Corp.*, 206 *N.J.Super.* 72, 80–81, 501 *A.2d* 1024 (App.Div.1985) (holding that ultimate outcome charge should be used to inform a jury of fact that its award will be subject to court's control until child reaches age of maturity); *Dimogerondakis v. Dimogerondakis*, 197 *N.J.Super.* 518, 485 *A.2d* 338 (Law Div.1984) (holding that ultimate outcome charge, which would inform jury that any damages awarded to plaintiff in personal injury action would be molded to reflect only that percentage of liability which jury attributes to nonsettling defendant, was warranted).

In *Scafidi*, we acknowledged that the jury's verdict would be molded by the trial court to reflect only the portion of the damages that were attributable to defendant's negligence. We explained:

> Based on the evidence adduced, the jury will be instructed to determine the likelihood, on a percentage basis, that the [harm] would have occurred even if defendant's treatment was faultless. In the event of a jury verdict against defendant on liability and damages, the trial court will mold the verdict to limit defendant's liability to the value of the lost chance for recovery attributable to defendant's negligence.

> [*Scafidi, supra,* 119 *N.J.* at 115, 574 *A.2d* 398.]

Recognizing the value of an ultimate outcome charge in lost-chance cases, the Supreme Court Committee on Model Jury Charges included such a charge in its suggested jury instructions for medical malpractice cases governed by *Scafidi:*

> If you find that defendant has sustained his/her burden of proof, then you must determine based on the evidence what is the likelihood, on a percentage basis, that the plaintiff's ultimate injuries (*condition*) would have occurred even if defendant's treatment was proper.

> When you are determining the amount of damages to be awarded to the plaintiff, you should award the total amount of damage. Your award should not be reduced by your allocation of harm. The adjustment in damages which may be required will be performed by the Court.

[*New Jersey Model Jury Charges (Civil)* (4th ed. § 5.36E (emphasis added).]

## VII

Plaintiff requested that the trial court include an ultimate outcome charge in its instructions to the jury. Such a charge, plaintiff asserts, would have informed the jurors that they should award the full amount of damages and that the court would reduce that award by half. Plaintiff contends that an ultimate outcome charge was necessary because throughout the trial the jury heard testimony that, as of the date of the alleged malpractice, Mrs. Fischer had a fifty percent chance of cure. Plaintiff's counsel was concerned that the jury would likely infer from this testimony that plaintiff's total damages equalled half of what the total damages actually were. Because the court refused to give the ultimate outcome charge, plaintiff contends that the jury itself compromised its award to reflect the value of the lost chance.

When the court charged the jury, it instructed the jurors on several occasions that if they found the defendant(s) negligent, they should award to plaintiff the full extent of damages. Because the lost-chance percentage had been pre-determined, the trial court rejected plaintiff's request for an ultimate outcome charge. The court stated:

> Since I am intending to charge the jury in full as to their having to award the fullest extent of damages that they find, I don't see any benefit to be served by informing the jury that once they do that I'm going to take away half the verdict that they decide, because the only natural outcome of that is either that they will double the amount of their award or they will misunderstand the charge, and not understand why I'm saying what I'm saying. And otherwise—and I don't see that it has any bearing on the jury function. The jury function is to determine the amount of damages which will fully and fairly compensate the plaintiff. Not to be informed that once they do that I'm going to cut the award by 50 percent.

The Appellate Division, after holding that *Scafidi* did not apply to this case, summarily rejected plaintiff's ultimate outcome charge argument:

> We assume that in a case to which *Scafidi* measure of damages is applicable, the court should give the jury an "ultimate outcome" charge. *See New Jersey Civil Model Jury Charges* (4th ed. 1992) § 5.36E. However, we have determined that that measure of damages is inapplicable to the present case. The jury charge in

> this case, when read as a whole, clearly instructs the jury to award plaintiff the entire amount of damages to which he is entitled. There is nothing about the charge which supports plaintiff's argument that it may have led the jury to reduce Mrs. Fischer's compensation by half before returning the verdict.
>
> [277 *N.J.Super.* at 310, 649 *A.*2d 875.]

The value of an ultimate outcome charge in lost-chance cases is that it informs the jurors of the effect of their causation apportionment. The charge makes clear to jurors that they are to award full damages, and the *trial court* will make any necessary adjustments in light of their findings. Without the charge, there is the risk that the jurors will reduce their damage award in light of the apportionment of fault they find as part of their verdict. Then, once the trial court makes the same reduction, the plaintiff would receive an inadequate recovery. When a *Scafidi* damage-apportionment rule is applicable, an ultimate outcome charge generally should be given.

▪ The trial court, in the exercise of its discretion, did not give an ultimate outcome charge because it concluded that such a charge would "tend to mislead or confuse the jury," because "[t]hey don't have to reach a conclusion of what percent the chance of survival was in this case." However, even though the jury did not decide the percentage of lost chance of recovery, an ultimate outcome charge would have clarified matters. It would have explicitly separated in the jury's mind the fifty percent stipulation from the damages award. Accordingly, we find that the trial court erred by declining to provide an ultimate outcome charge.

▪ Reversible error, however, will not be found where the charge, considered as a whole, adequately conveys the law and is unlikely to confuse or mislead the jury, even though part of the charge, standing alone, might be incorrect. *Latta v. Caulfield,* 79 *N.J.* 128, 135, 398 *A.*2d 91 (1979); *Jurman v. Samuel Braen, Inc.,* 47 *N.J.* 586, 592, 222 *A.*2d 78 (1966). The charge in this case generally conformed to the model jury charge for increased risk cases. Throughout the trial, the jury heard testimony that as of the date of the alleged malpractice Mrs. Fischer had a fifty percent chance of cure. The jurors were also instructed that, as a

matter of law, there was a fifty percent likelihood of the ultimate harm occurring absent any negligence. Yet the court never explained the impact of those facts on the plaintiff's ultimate recovery of damage. The court never informed the jury that any award would be reduced by the court to reflect the value of the lost chance. We have examined the record carefully and conclude that that omission was capable of misleading the jury. Under those circumstances, the jury may have concluded that they were to award half of the total damages suffered by decedent. An ultimate outcome charge should have been given to prevent juror confusion and the possibility that jurors carried the fifty percent proximate cause figure over into their deliberations on damages.

## VIII

We reverse the judgment of the Appellate Division and remand the matter to the trial court for a new trial on damages only in accordance with this opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.