

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-24-2001

# Gillman v. Waters McPherson

Precedential or Non-Precedential:

Docket 00-2111

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Gillman v. Waters McPherson" (2001). *2001 Decisions.* Paper 247.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/247

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 24, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 00-2111

RICHARD GILLMAN,
        Appellant,

v.

WATERS, MCPHERSON, MCNEILL, P.C.;
ESTATE OF JACK ROSEN, THE

On Appeal from the United States District Court
for the District of New Jersey
District Judge: Honorable John C. Lifland
(D.C. No. 99-00037)

Argued: May 9, 2001

Before: BECKER, Chief Judge, MCKEE, Circuit Judge,
and POLLAK, District Judge*

(Filed: October 24, 2001)

        Robert Novack, Esquire (Argued)
        Edwards & Angell
        51 John F. Kennedy Parkway
        Short Hills, New Jersey 07078
Counsel for Appellant

_____

* Honorable Louis H. Pollak, United States District Judge for the Eastern
District of Pennsylvania, sitting by designation.

        Brian C. Harris, Esquire (Argued)
        Braff, Harris & Sukoneck
        570 W. Mt. Pleasant Avenue,
         P.O. Box 657
        Livingston, New Jersey 07039
        Counsel for Appellees

OPINION OF THE COURT

POLLAK, District Judge.

This appeal from a grant of summary judgment presents
questions arising under New Jersey's "entire controversy
doctrine" -- a body of law that has given rise to much
litigation and a substantial body of academic commentary.

I.

With a view to clarifying the setting in which the
questions on appeal are presented, we begin by describing
the underlying controversy, and the resultant state court
litigation, which together form the predicate for the case at
bar.

Appellant Richard Gillman was for many years a senior
executive of Bally Manufacturing Corporation ("BMC"), and
of Bally's Park Place, Inc. ("Park Place"), the casino
operating arm of BMC. (In this opinion, when Park Place
and BMC are referred to jointly, or without need to
distinguish one from the other, they are designated"Bally").
In 1991 Gillman and Bally entered into Stock Option Award
Agreements under which Gillman received options to
purchase 1,000,000 shares of BMC and 300,000 shares of
Bally Gaming International, Inc., a BMC subsidiary; these
options, of very considerable potential value, were to be
exercisable over a period of ten years. In 1992, pursuant to
a management reorganization, it was determined that
Gillman would leave Bally. To represent him in negotiating
with Bally an agreement governing the terms of his
anticipated separation, Gillman retained Waters,
McPherson, McNeill, P.C. ("Waters, McPherson"), a New
Jersey law firm that had for some years performed legal

2

services both for Gillman and for Bally (and that continued to handle some of Gillman's affairs until 1998). Kenneth D. McPherson, Sr. and Jack Rosen were the two Waters, McPherson partners who had principal responsibility for negotiating and drafting, on Gillman's behalf, the agreement pursuant to which he was to leave Bally.

It was a matter of substantial importance to Gillman that the elaborate agreement governing his retirement from Bally preserve his entitlement to exercise his stock options for the balance of the ten-year period agreed upon by Gillman and Bally in 1991 -- i.e., until 2001. On January 8, 1993, Gillman executed the Retirement and Separation Agreement, and, simultaneously, retired. Gillman, according to his later testimony, understood that the Retirement and Separation Agreement protected the ten-year entitlement to exercise the stock options. However, when, on January 24, 1994, Gillman undertook to exercise options for the purchase of 100,000 Bally shares, he was informed by Bally that his unexercised options had expired on January 8, 1994, the first anniversary of his retirement. (Bally's position was that (a) Gillman's Stock Option Award Agreements provided that a Bally employee had a ten-year purchase window for the exercise of vested options but that a retired employee's purchase window was only one year, and (b) the Retirement and Separation Agreement"vested" Gillman's option rights as of the date of his retirement and provided that exercise of those vested rights was to be "in accordance with the applicable provisions" of the Stock Option Award Agreements -- hence, one year.)

In March of 1994 -- two months after Bally refused to honor Gillman's stock options -- Gillman filed suit against Bally in the New Jersey Superior Court to enforce his claimed stock option rights. Gillman was represented by Frederic K. Becker, a partner in the New Jersey firm of Wilentz, Goldman, Spitzer, P.C.; McPherson and Rosen advised Becker, and Rosen supplied an affidavit supporting Gillman's claims. On July 18, 1994, while Gillman's suit was pending in the Superior Court, Becker wrote Gillman a letter recapitulating a June 30 conference:

3

PERSONAL & CONFIDENTIAL

July 18, 1994

Mr. Richard Gillman
c/o Waters, McPherson, McNeill
300 Lighting Way
Secaucus, NJ 07096

Re: Gillman v. Bally Manufacturing Corporation, et al.

Dear Dick:

 This will confirm the matters discussed and agreed upon when Roger Kaplan and I met with you on June 30, 1994, with respect to certain issues raised by the above-referenced litigation.

 As you had previously discussed with Kenneth D. McPherson, Sr., the fact that you have been required to institute suit against Bally Manufacturing Corporation and Bally's Park Place, Inc. raises certain issues regarding claims that you may have against the firms of Waters, McPherson, McNeill and Shereff, Friedman, Hoffman & Goodman for professional malpractice in connection with representing your interests relevant to your Retirement and Separation Agreement, and the exercise of your options, which are the subject of the above-referenced litigation: (a) in the negotiation of your Retirement and Separation Agreement (specifically in connection with Section 2(d) of that Agreement, as it relates to the "Retirement" paragraphs of the Option Agreements); and (b) in connection with advising you as to the potential effect of Section 2(d) of the Retirement and Separation Agreement, insofar as that section might, when read with the relevant provisions of the Option Agreements, cause your options to terminate within one year.

 A recent decision in New Jersey suggests that any such claims for professional malpractice are presently ripe and assertable by you by reason of the fact that you have already incurred an injury and damages arising from the need to pursue litigation against Bally Manufacturing and Bally's Park Place, causing the expenditure of sums for attorneys' fees and litigation

4

costs, and that you need not wait to assert such claims until after the conclusion of the litigation with Bally Manufacturing and Bally's Park Place.

Moreover, given that such claims would likely be presently assertable, the New Jersey courts have a requirement under what is called the "entire controversy doctrine," that all claims against all parties relating to the same controversy or subject matter should be asserted in a single litigation or, if not asserted, be forever barred and precluded in the future. As a result, if these potential claims for professional malpractice are not now asserted in the present litigation with Bally Manufacturing and Bally's Park Place, such claims would, in all likelihood, be barred and precluded from being asserted by you in the future. If such claims were to be asserted in the pending litigation, the Court might (or might not) decide to separate these claims from the claims against Bally Manufacturing and Bally's Park Place, but we would expect that Bally would argue against the severance of such claims and would argue that the attorney-client privilege was waived by you by suing your own attorneys, thereby possibly opening up for discovery your confidential or attorney-client communications with these law firms.

You told us that you had a similar conversation with Kenneth D. McPherson, Sr., and had given the subject a considerable amount of reflection and consideration in the past. You also told us that you were of the view that you did not want to pursue a claim against these law firms, notwithstanding the fact that the failure to assert the claims now would likely make it impossible to assert the claims at a later date.

As a result of your determination not to assert any claims against either Waters, McPherson, McNeill or Shereff, Friedman, Hoffman & Goodman, we will not, as we advised you, take any action to protect or preserve your interests in asserting any claims against either of these firms.

5

     Please call me if you have any questions or if you
     want to discuss further any issues addressed by this
     letter.

     Sincerely,
     FREDERIC K. BECKER

     FKB:ald

It appears that the June 30 conference and the July 18
letter were responsive to the February 16, 1994 decision of
the Appellate Division of the Superior Court in Circle
Chevrolet Co. v. Giordano, Halleran & Ciesla, 274 N.J.
Super. 405 (App. Div. 1994), holding that attorney
malpractice claims were one of the categories of claims
embraced by the entire controversy doctrine, with the result
that non-inclusion in an underlying action of claims of
attorney malpractice that, putatively, gave rise to the
necessity of the underlying action, might result in
preclusion of such claims. Notwithstanding Becker's July
18 letter, Gillman did not alter the position he appears to
have taken in the June 30 conference -- namely, that he
would not authorize enlarging the scope of the Bally suit by
adding malpractice claims against Waters, McPherson.

On August 23, 1994, Judge Margolis, Presiding Judge of
the Chancery Division of the Superior Court, granted
Bally's motion for summary judgment and denied Gillman's
motions for partial summary judgment. In the concluding
pages (pages 20-22) of his opinion, Judge Margolis wrote as
follows:

     Gillman's retirement from Bally was governed by a
     Retirement and Separation Agreement that
     incorporated other agreements by reference. Pursuant
     to the terms of those agreements, Gillman had one year
     within which to exercise his options. For whatever
     reason, Gillman failed to do so. Although Gillman
     thereby sustained significant monetary losses, he
     executed a contract that was negotiated at arm's length
     by competent counsel.

     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. .

     . . . . . [G]illman was represented by competent counsel
     at all relevant times -- he was a sophisticated

                                6

> businessman upon whose behalf a detailed agreement
> was negotiated. . . . [I]f Gillman was not aware of the
> option exercise date, his counsel was, or should have
> been.

Gillman appealed. While Gillman's appeal was pending,
the New Jersey Supreme Court affirmed the Appellate
Division's ruling in Circle Chevrolet that attorney
malpractice claims were subject to the entire controversy
doctrine. Circle Chevrolet Co. v. Giordano, Halleran &
Ciesla, 142 N.J. 280, 662 A.2d 509 (1995). On Gillman's
appeal, Kenneth McPherson, Jr., of Waters, McPherson
joined Frederic Becker as counsel of record.

The Appellate Division affirmed Judge Margolis's grant of
summary judgment. "The trial court properly enforced the
express, bargained-for terms of his Option Agreement and
Retirement and Separation Agreement, and refused to grant
plaintiff equitable relief from the consequences of his and
his counsel's neglect." Gillman v. Bally Mg. Corp., 286 N.J.
Super. 523, 531, 670 A.2d 19 (N.J. App. Div. 1996).

The decision of the Appellate Division was handed down
on January 4, 1996.

On January 20, 1996, Jack Rosen died.

On March 20, 1996 the New Jersey Supreme Court
denied certification. 144 N.J. 174, 675 A.2d 1122 (1996).

II.

As Gillman's unsuccessful litigation against Bally made
its way through the courts of New Jersey between 1994 and
1996, it was paralleled by the Circle Chevrolet  litigation in
which the Appellate Division in 1994 announced, and the
New Jersey Supreme Court in 1995 confirmed, that New
Jersey's entire controversy doctrine embraced attorney
malpractice claims. The entire controversy doctrine has not
been a favorite of the New Jersey bar, and its extension to
attorney malpractice claims was not widely acclaimed.
". . . [T]he failure to exclude legal malpractice claims from
the Entire Controversy doctrine . . . harms attorneys,
clients, and the legal system itself. The sooner our Supreme
Court reconsiders its opinion in this matter, the better off

we will all be." Albert L. Cohn and Terri Smith, Practice and Malpractice after Circle Chevrolet: Some Practical Considerations of the Entire Controversy Doctrine , 28 Rutgers L. J. 79, 84-85 (1996). Academic criticism of Circle Chevrolet tended to be more restrained. As Professor Hazard put it, "Why, in the name of any conception of justice and good order, should a client engaged in a complicated, expensive and protracted controversy with an opposing party be required to enlarge and complicate that litigation, perhaps with fatal effects on its merits, by extending the attack to his own lawyer in the middle of the proceeding?" Geoffrey C. Hazard, Jr., Before and Behind the "Entire Controversy" Doctrine, 28 Rutgers L. J. 7, 24 (1996).

In 1997 the New Jersey Supreme Court did "reconsider its opinion." The court's new ruling was announced in Olds v. Donnelly, 150 N.J. 424, 696 A. 2d 633 (1997). The court stated that (1) "[w]e are aware of the criticism of Circle Chevrolet's expansion of the entire controversy doctrine to attorney-malpractice actions," 696 A. 2d at 641, (2) "[c]andor compels that we acknowledge that the application of the entire controversy doctrine to legal-malpractice claims has not fulfilled our expectations," ibid., and (3) "[i]n sum, we conclude that the entire controversy doctrine no longer compels the assertion of a legal-malpractice claim in an underlying action that gives rise to the claim." Id. at 643.

In January of 1999, Gillman (formerly a citizen of New Jersey, but now a citizen of Florida) filed the instant diversity action in the United States District Court for the District of New Jersey. The named defendants were Waters, McPherson and the Estate of Jack Rosen (the Waters, McPherson partner who, together with Kenneth McPherson, Sr., had represented Gillman in negotiating and drafting the Separation Agreement). The suit -- initiated a year-and-a-half after Circle Chevrolet was overruled by Olds -- alleged malpractice.

The defendants moved for summary judgment. Gillman filed a cross-motion for partial summary judgment. The District Court granted defendants' motion. In its Memorandum and Order the District Court first addressed the question "whether the Court should apply the short-

8

lived legal malpractice claim preclusion rule articulated by the New Jersey Superior Court, Appellate Division, in early 1994, adopted by the New Jersey Supreme Court in Circle Chevrolet Co. v. Giordano, Halleran & Ciesla, 142 N.J. 280 (1995), and overruled two years later in Olds v. Donnelly, 150 N.J. 424 (1997)." Memorandum and Order, p. 8. The District Court's analysis was as follows:

In abrogating Circle Chevrolet, the Olds court contemplated the extent of retroactive effect it should give to its decision and specifically held that the decision should be given "limited or `pipeline' retroactivity" rather than full retroactive effect. See [150 N.J.] at 449. The court explained that its decision should apply to cases in the litigation "pipeline," that is, "all pending cases, whether on appeal or in the trial courts." Id. . .

Gillman argues that because this malpractice action was filed after the Olds ruling, it is governed by Olds and not by Circle Chevrolet, and thus the ECD [entire controversy doctrine] would not bar his legal malpractice claim for failure to have joined it in the prior state court action. Gillman's legal theory would grant full retroactive effect to the Olds decision such that all attorney malpractice claims that had accrued under Circle Chevrolet and that were not yet time-barred would be resurrected. This interpretation would render meaningless the plain words of the New Jersey Supreme Court's decision regarding retroactivity. In holding that legal malpractice claims were no longer subject to the ECD, the court plainly stated that the Olds decision would be accorded only limited retroactive effect such that cases already in the litigation pipeline -- cases "on appeal or in the trial courts" -- would receive the benefit of the new rule. Necessarily, cases that were not yet pending in the trial courts or on appeal, thus not in the pipeline, would not receive the benefit of the Olds abrogation of Circle Chevrolet. Claims that accrued under Circle Chevrolet and that were not in the pipeline at the time of the Olds decision on July 16, 1997 are clearly subject to the Circle Chevrolet rule, not the Olds rule.

9

Gillman's legal malpractice claim accrued long before the Olds decision. At the latest, Gillman knew that he had a potential malpractice claim against Waters, McPherson when he received the July 18, 1994 letter from Becker explaining the claim-preclusive effect that the ECD could have on any potential legal malpractice claim Gillman might want to assert against Waters, McPherson.

Memorandum and Order, pp. 10-11 (footnote omitted).

Toward the close of its Memorandum and Order, the District Court stated an alternate ground for its grant of summary judgment:

Furthermore, the Court does not view Gillman as an unsuspecting victim of the ECD's claim-preclusive impact. He was fully informed by his attorney during the pendency of his state court action that he must assert any potential legal malpractice claim against Waters, McPherson at that time and he did not. Quite the contrary, he assured his attorneys that he would not assert a malpractice claim against them in the pending state court action. Thereby, Gillman voluntarily surrendered a known right. Accordingly, even in the absence of the Circle Chevrolet ruling Gillman's claim could be barred under the doctrine of waiver.

III.

A.

In approaching the question whether the District Court's grant of summary judgment was warranted, we first consider the District Court's assessment of the limited retroactive effect of Olds. The District Court, it will be recalled, observed that "Gillman's legal theory would grant full retroactive effect to the Olds decision such that all attorney malpractice claims that had accrued under Circle Chevrolet and that were not yet time-barred would be resurrected," and stated that "[t]his interpretation would render meaningless the plain words of the New Jersey Supreme Court's decision regarding retroactivity," since

10

"the court plainly stated that the Olds decision would be accorded only limited retroactive effect such that cases already in the litigation pipeline -- `cases on appeal or in the trial courts' -- would receive the benefit of the new rule."

This meant, so the District Court reasoned, that cases "that were not in the pipeline at the time of the Olds decision on July 16, 1997 are clearly subject to the Circle Chevrolet rule, not the Olds rule." And, since Gillman's suit, although arising out of events that transpired during the Circle Chevrolet era, was not initiated until 1999, and hence was not pending on July 16, 1997, it was, under the District Court's analysis of the Olds court's pronouncement with respect to the limited retroactive impact of its decision, barred by Circle Chevrolet.

To assess the correctness of the District Court's analysis, we set forth in full the Olds court's discussion of retroactivity:

> The parties have not briefed or argued the issue whether the within decision should apply retroactively or prospectively. In fairness to other litigants and the judicial system, however, we conclude that our decision should apply not only to the present case, but to all pending cases, whether on appeal or in the trial courts.
>
> Ordinarily, judicial decisions apply retroactively. Crespo v. Stapf, 128 N.J. 351, 367, 608 A.2d 241 (1992). Policy considerations may justify giving a decision limited retroactive effect. Id. The first consideration is whether litigants reasonably have relied on settled law in ordering their affairs. Id. at 368. Another consideration is whether retroactive application will advance the purposes of the rule announced in the decision. Id. at 370. "The final consideration is whether retroactive application would produce inequitable results and adversely affect the administration of justice." Id. at 371.
>
> Here, those considerations point toward limited or "pipeline" retroactivity of our decision. First, we decided Circle Chevrolet only two years ago, a factor that affects the extent to which litigants reasonably have relied on

11

the application of the entire controversy doctrine to
legal-malpractice claims. Second, the general purpose
of the legal-malpractice exception is to preserve the
attorney-client relationship. Limited retroactivity will
adequately protect existing relationships. Giving the
benefit of our decision to litigants with pending cases
serves the interests of justice by permitting resolution
of their claims on the merits. Complete retroactivity,
however, potentially would expose the judicial system
to the undue burden of resolving numerous concluded
matters.

696 A.2d at 646.

In applying the Olds rule of "limited or`pipeline'
retroactivity" to Gillman's suit, the District Court ruled that
Gillman's suit was not yet in the "pipeline" when Olds was
decided and hence was barred. We agree with the District
Court that Gillman's suit, not filed until 1999, was not in
the pipeline on July 16, 1997, when Olds was decided. But
we do not agree that the Olds court, in clothing its ruling
with "limited or `pipeline' retroactivity," meant by the use of
that phrase to exclude from the coverage of Olds  a suit filed
subsequent to July 16, 1997 (provided, of course, that the
suit was filed within the applicable six-year statute of
limitations, as Gillman's was). We think that in determining
that its new rule was to have " `pipeline' retroactivity," the
court in Olds signified that it was selecting from available
options the rule of limited retroactivity which the court had
described and applied just a year before, in State of New
Jersey v. Knight, 678 A. 2d 642 (1996). In Knight the court
explained that to "give [a] new rule `pipeline retroactivity,' "
is to "render[ ] it applicable in all future cases, the case in
which the rule is announced, and any cases still on direct
appeal." Id. at 651. "[P]ipeline retroactivity" was contrasted
by the Knight court with "complete retroactive effect" which
involves "applying [the new rule] to all cases, including
those in which final judgments have been entered and all
other avenues of appeal have been exhausted." Ibid.

Viewing Gillman's malpractice suit through the prism of
"pipeline retroactivity" as deployed in Knight and in Olds, it
falls within the category of what Knight termed "future
cases." 678 A. 2d at 651. Thus, we think that, if the New

12

Jersey Supreme Court were today to have occasion to address a suit like Gillman's malpractice suit against Waters, McPherson and the Rosen Estate -- a suit which was not in fact filed until after Olds was decided, but a suit which could have been filed during the brief hegemony of Circle Chevrolet and which would then have properly been found by the lower courts of New Jersey to be non-cognizable -- the New Jersey Supreme Court would rule that such a suit was governed by Olds.

In predicting how the New Jersey Supreme Court would rule, we do not confine ourselves to a textual deconstruction of the term "pipeline retroactivity." We are also guided by the three-factor inquiry on which that court has long relied in determining the scope of retroactive application of a new rule. See, e.g., Fischer v. Canario, 143 N.J. 235, 244-245, 670 A.2d 516, 521 (1996). As the court explained in Fischer a year before Olds was decided, "the competing considerations in each case are weighed by examining the following three factors: (1) the purpose of the new rule and whether it would be advanced by retroactive application; (2) the reliance placed on the old rule by the parties and the community; and (3) the effect that retroactive application would have on the administration of justice." Ibid., citing Rutherford Educ. Ass'n. v. Rutherford Bd. of Educ., 99 N.J. 8, 22, 489 A.2d 1148 (1985), and State v. Burstein, 85 N.J. 394, 406, 427 A.2d 525 (1981).

First, we consider the purpose of the Olds rule and inquire whether that purpose would be effectuated by applying it to Gillman's situation. Three purposes may be said to support the Olds rule: to preserve the sanctity of the attorney-client relationship, to foster judicial efficiency, and to increase fairness. All three are well served by extending the Olds rule to Gillman's situation: (1) The Olds rule is protective of the attorney-client relationship in that it permits a client to avoid what Circle Chevrolet appeared to mandate: undermining a current attorney-client relationship by joining the lawyer as a malpractice defendant in underlying litigation. (2) The Olds rule promotes judicial efficiency by obviating the necessity of enlarging and complicating the underlying litigation through the addition of a malpractice claim before the

13

plaintiff can ascertain whether the result in the underlying litigation renders the malpractice claim unnecessary. (3) The rule relieves a client of the Hobson's Choice, imposed by Circle Chevrolet, of, on the one hand, surrendering the attorney-client privilege by adding a claim for malpractice in the underlying litigation, or on the other hand, surrendering the right to pursue a malpractice claim in the future.

Second, we consider the extent to which the parties and the larger community may have relied on the rule the Olds court jettisoned. As the Olds court concluded, the Circle Chevrolet rule was of such short duration -- only two years -- as to encourage little reliance. Moreover, criticism and calls for the overruling of Circle Chevrolet were so immediate and so vehement that any reliance thereon could only have been tentative.

Third, we consider the impact of retroactive application of the new rule on the administration of justice. We think that bringing within the ambit of Olds those cases, like the case at bar, in which the cause of action had accrued, but no claim had been filed, when Olds was decided, would not be detrimental to the administration of justice because it would not involve the reopening of cases that had been fully adjudicated. Furthermore, the Olds rule promotes the resolution of attorney malpractice claims on the merits, rather than on the basis of the arcane procedural jurisprudence spawned by Circle Chevrolet.

In sum, we conclude that the "pipeline retroactivity" called for by the Olds court requires the application of Olds to Gillman's claim.

B.

We turn now to the District Court's alternate ground for granting summary judgment: Gillman, so the District Court put it, "assured his attorneys that he would not assert a malpractice claim against them in the pending state court action. Thereby, Gillman voluntarily surrendered a known right. Accordingly, even in the absence of the Circle Chevrolet ruling, Gillman's claim could be barred under the doctrine of waiver."

14

Some of the evidence before the District Court lent support to a finding that Gillman knowingly and intelligently disavowed any thought of suing Waters, McPherson. But other evidence cut in a different direction. In his sworn declaration submitted in opposition to defendants' summary judgment motion, Gillman described the difficult choice he confronted when Becker told him about the potential impact of the entire controversy doctrine. "Faced with the dilemma, I accepted the assurances I received from McPherson and Rosen that my position in the Bally Litigation would prevail, and that the Court would conclude that I had ten years to exercise my options. It appeared to be against my best interests to add Waters, McPherson to the Bally Litigation (thereby waiving my attorney-client privilege) especially since none of my attorneys suggested that I even had a claim against Waters, McPherson. To this day, McPherson has denied that his firm was negligent [citing deposition testimony of Kenneth McPherson, Sr.]." Gillman Declaration, paragraph 31. Further, according to Gillman, "I never waived or relinquished my rights to file a claim against Waters, McPherson. Nor did I ever inform Mr. Becker or anyone at Waters, McPherson that I had waived or relinquished any claims that I had against the firm. During those years, I merely accepted the assurances that McPherson and Rosen repeatedly gave me that I would prevail in the Bally Litigation and mindful of the advice Mr. Becker gave me that joining Waters, McPherson would create serious tactical problems, determined not to join Waters, McPherson as a defendant in the Bally Litigation which would have required me to sever my attorney-client relationship with the firm."

With the record in this posture, a grant of summary judgment on the issue of waiver was inappropriate."Waiver, under New Jersey law, involves the intentional relinquishment of a known right, and thus it must be shown that the party charged with waiver knew of his or her legal rights and deliberately intended to relinquish them . . . Questions of waiver, therefore, are usually questions of intent, which are factual determinations that should not be made on a motion for summary judgment." Shebar v. Sanyo Business Systems Corp., 544 A.2d 377,

15

384 (N.J. 1988); accord, Garden State Buildings, L.P., v. First Fidelity Bank, N.A., 702 A.2d 1315, 1325 (N.J. Super. 1997).1

Conclusion

For the foregoing reasons the judgment of the District Court is reversed and the case remanded for further proceedings consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

_____

1. It may be added that the complexity of establishing "that the party charged with waiver knew of his or her legal rights and deliberately intended to relinquish them" is significantly compounded in a setting, such as that presented in the case at bar, in which the legal principles that constitute the framework within which a choice is to be made, while seemingly valid at the time of the choice, are subsequently undercut by later case law.

16